# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

CASCADE CAPITAL GROUP, LLC          PLAINTIFF

v.          CAUSE NO. 3:17cv952-LG-MTP

LIVINGSTON HOLDINGS, LLC;
CHESTNUT DEVELOPERS, LLC;
DAVID LANDRUM; and MICHAEL L.
SHARPE          DEFENDANTS

AND

LIVINGSTON HOLDINGS, LLC;
CHESTNUT DEVELOPERS, LLC; and
MICHAEL L. SHARPE          COUNTERCLAIMANTS

v.

CASCADE CAPITAL GROUP, LLC          COUNTERDEFENDANT

AND

LIVINGSTON HOLDINGS, LLC;
CHESTNUT DEVELOPERS, LLC; and
MICHAEL L. SHARPE          THIRD PARTY PLAINTIFFS

v.

MARK CALVERT          THIRD PARTY DEFENDANT

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is the [74] Motion for Summary Judgment filed by

Plaintiff Cascade Capital Group, LLC ("Cascade") and Third-Party Defendant Mark

Calvert.  The Motion for Summary Judgment argues that no issues of material fact remain with regard to either the First Amended Complaint or the Amended Counterclaims and Third Party Claims, such that summary judgment may be granted in favor of Cascade and Calvert.  The Motion is fully briefed.  Having considered the submissions of the parties and applicable law, the Court concludes that Cascade is entitled to summary judgment on its breach of contract claim and that Cascade and Calvert are entitled to summary judgment on Defendants' breach of the duty of good faith and fair dealing counterclaim and third party claim. However, unresolved material issues of fact preclude granting summary judgment on Defendants' counterclaim and third party claim for breach of fiduciary duty.

## I. BACKGROUND

This lawsuit derives from Defendants' alleged default on a Promissory Note ("the Note"), as modified by a subsequent Forbearance Agreement ("the Agreement"), used to fund the re-development of the old Town of Livingston in Madison County, Mississippi.  (*See* Am. Compl., ECF No. 8.)  Cascade's Amended Complaint seeks the appointment of a receiver to take possession and control of Defendants' property – which is designated as collateral in the Note and the Agreement – and a joint and several judgment against Defendants for the principal and interest due on the Note (as modified by the Agreement), attorneys' fees, and collection costs.

Livingston, Chestnut, and Sharpe filed amended answers to Cascade's complaint on August 21, 2018, asserting both counterclaims and third party claims.

(Sharpe Am. Answer, Countercl., & Third Party Compl., ECF No. 51; Livingston & Chestnut Am. Answer, Countercl., & Third Party Compl., ECF No. 52.) They assert counterclaims for breach of fiduciary duty and breach of duty of good faith and fair dealing against Cascade and third party claims for the same against Calvert. They maintain that Calvert is personally liable for the conduct of Cascade because Cascade is merely his alter ego, thus not entitled to treatment as a separate entity.[1]

In 2008, David Landrum,[2] Chestnut, and Livingston began to re-develop the Town of Livingston ("the Project") in Madison County, Mississippi. Chestnut's sole member is Livingston. Livingston's members were originally Marna Sharpe (Michael Sharpe's wife) and Jill Landrum (David Landrum's wife), but in October 2014, Mike Bollenbacher became Livingston's third member. Chestnut acquired land and plans for a multi-use development. In 2011, a loan was secured from BankPlus to fund a portion of the Project. Chestnut provided BankPlus with a promissory note in the principal amount of $978,287.17, secured by a Deed of Trust granted to BankPlus by Chestnut.

In 2012, Livingston began looking for assistance "to move the development forward and to recapitalize with more equity and/or new borrowing" because "[a] difficult economy [had] caused the Livingston Project to move slowly." (Mem. Supp. Resp. Opp. 4, ECF No. 89.) Livingston engaged the consulting services of Cascade by July of that year, but the parties have not located a signed copy of the engagement letter. Cascade submitted an unsigned copy of the supposedly agreed-

---

[1] Calvert is Cascade's sole member.
[2] David Landrum is a named defendant in this lawsuit, but he is not the subject of the summary judgment motion entertained by this opinion.

upon engagement letter. (*See* Mot. Summ. J. Ex. 5, at 63-65, ECF No. 74-2 (ECF pagination).) Livingston maintains that no such letter was ever signed and agreed-upon. Defendants have produced invoices detailing fees for services beginning July 25, 2012, including an "Initial meeting" on July 26, 2012. (*See* Resp. Opp. Ex. 3, at 1, ECF No. 88-3.) A description next to services rendered on September 7, 2012 notes that Calvert "discussed need to get signed engagement letter before information is distributed." (*Id.* at 3.)

Sharpe says that Cascade identifies itself as a professional service firm with a broad background in finance, debt restructuring, and turnarounds. Sharpe says Calvert represented that he had assisted hundreds of clients to buy, sell, and restructure businesses and that he had substantial experience in cleaning up troubled operating and real estate companies.

According to Defendants, Calvert recommended to David Landrum that he borrow money from Michael Sharpe – a longtime friend of David Landrum – for the Project. Sharpe loaned funds to Livingston, made capital contributions to the Project, and personally guaranteed the BankPlus loan. Sharpe says that, in making these and further contributions to the Project, he relied heavily on the representations and advice of Calvert because Sharpe is not a real estate development professional.

The BankPlus note matured December 15, 2013, and Livingston was unable to pay off the balance of $468,193.53. David Landrum met with Terry Howard, a BankPlus loan officer, on December 16, 2013 to discuss the loan and request a 60 to

90-day renewal of the loan. Landrum memorialized the meeting with an email, on which Calvert and Sharpe were copied. On December 23, 2013, Landrum emailed Calvert stating, "We have the cash pulled together for Bankplus except for 30k. If you can help us with this remaining amount we will pay you back first when cottage financing is closed. . . . This at least gets us to March." (Mot. Summ. J. Ex. 7, at 68, ECF No. 74-2 (ECF pagination).) Calvert wired $30,000 to Livingston's account the same day. Also the same day, Chestnut paid BankPlus $60,500 towards the loan balance in exchange for a three-month extension on the loan's maturity date to February 15, 2014. Landrum, in his capacity as Manager of Chestnut, executed a related Change in Terms Agreement, which reflected an extension loan balance of $412,329.94.

On January 28, 2014, Landrum emailed Calvert stating that Livingston needed $20,000 for a deposit on "the cottage designs" and another $5,300 "owe[d to] Nolan." (*Id.* Ex. 10, at 88 (ECF pagination).) Calvert wrote back,

> I will do another 30k so 60k in total if . . .
> You have your attorney do the legal work to give me a lien
> in the Cottage Lots for the 60k and professional fees . . .
> And a personal guarantee from both of you . . .
> Same term just like we discussed before . . .

(*Id.* (all sic and ellipses in original).) David agreed to those terms on behalf of both himself and Sharpe. Andy Clark, their attorney, drafted a promissory note for $60,000, plus $95,144.11 in professional fees incurred through December 31, 2013 and any additional fees incurred throughout the duration of the Note, due February 1, 2015.

Thomas Hudson, General Counsel for BankPlus, wrote Chestnut, Landrum, and Sharpe on March 7, 2014 to inform them of their default on the BankPlus note. Hudson cautioned that legal action would be taken against them to collect on the note if the amount of $418,664.03 in overdue principal, interest, and late fees was not paid by March 27, 2014. Calvert emailed Terry Howard on March 12, 2014, copying Landrum and Sharpe, to follow up on a phone call had earlier that morning. Calvert proposed that he personally refinance the loan through a new loan of $250,000 to Calvert along with Calvert's contribution of $250,000 of his own money. Calvert separately wrote to Sharpe, Landrum, and Clark stating,

> This will clearly result in a conflict of interest . . .
> Understand it will help you resolve an issue,
> But it will cause a conflict of interest.
> As a result . . . we will need a very detail conflict waiver
> done by your law firm.
> From a timing aspect we will also need to make sure this
> is done after the road litigation is resolved/settled. .
> We will need to determine the correct way to do this . . . .
> We can discuss after we hear back from the bank
> depending on what they say . . . .

(*Id.* Ex. 13, at 98 (ECF pagination) (all sic and ellipses in original).) Notwithstanding Calvert's stated need for a conflict-of-interest waiver, no waiver was prepared at the time.

On March 20, 2014, Landrum emailed Calvert to say that Sharpe had called him the previous night to share that Jamie Planck Martin – personal attorney for Mike Bollenbacher, who is a friend of Sharpe and a real estate professional – had called Sharpe recommending that Livingston allow Bollenbacher to buy the BankPlus note because "what [Calvert was] going to do was to buy the land and

that Bollenbacher would just do it where [Livingston] can pay the regular interest rate." (Resp. Opp. Ex. 5, at 3, ECF No. 88-6.)  Landrum wrote, "I told [Sharpe] that we definitely do not need to do that because going forward that just builds their case of all the good things they have done for us. . . .  I believe that he agrees with me but wants to run it by you to see what you think. . . ." (*Id.*)

BankPlus did not accept Calvert's refinancing proposal.  On March 24, 2014, Calvert emailed Landum, Sharpe, and Clark to outline the terms by which Calvert could personally buy out the BankPlus note: Cascade would make two loans to Chestnut – one for $500,000 at an interest rate of 20%, which would be used to purchase the BankPlus note, and another for $250,000, which would cover the cost of Cascade having to borrow from a bank – in exchange for Chestnut, Landrum, and Sharpe granting Cascade a lien in the Project's property.  (*See* Mot. Summ. J. Ex. 15, at 102, ECF No. 74-2 (ECF pagination).)  That evening, Landrum emailed Calvert, Sharpe, and Clark asking that they hold a conference call in order to collectively understand the terms for the loan proposed by Calvert.

The next day, March 25, 2014, Calvert emailed Chevis Sweatman, President of The People's Bank of Mississippi, stating that he was "looking at buying a troubled note from Bank Plus in Jackson MS." (*Id.* Ex. 17, at 104 (ECF pagination).)  Calvert had previously worked with Sweatman and The People's Bank to purchase a different loan in Las Vegas on an unrelated project.  Calvert stated that the note he sought to purchase belonged to a client with whom he had been working for eighteen months.  He proposed the following terms to Sweatman:

> What I was wanting to do is get you to finance say 400k
> and I will put up 200k . . .
> I will set up an interest reserve for say 2 years with the
> bank . . .
> Given it is going to take time for this project to get out of
> the ground and going . . . .
> I would like a 2 or 3 year interest only note at say 4.5% . .
> . . . and a 1% origination fee . . . .
> If you force me to . . . . I can do a 10 year note with
> amortization . . . . . if that will work better for you . . .

(*Id.* (all ellipses in original).) Chestnut executed a Deed of Trust, Security Agreement and Assignment of Lease of Rents in favor of Cascade. David Landrum and Jill Landrum signed this document, and Marna Sharpe specifically authorized Jill Landrum to execute the Deed of Trust on Chestnut's behalf.

The People's Bank rejected Calvert's loan request on April 2, 2014. On April 4, 2014, Michael Sharpe emailed David Landrum stating that he learned Calvert's loan had been denied and asking about further news related to paying off BankPlus. Landrum replied that they were working on a couple of other options, to which Sharpe asked, "Is Bollenbacher now a necessary option?" (*Id.* Ex. 22A, at 140 (ECF pagination).) Landrum responded, "Hopefully not." (*Id.*) On April 14, 2014, The People's Bank agreed to modified loan terms by which Calvert would borrow $425,000 and wire $75,000 as an interest and loan fee reserve. The loan would be secured, in part, by Calvert's collateral assignment of the BankPlus note and the Deed of Trust.

On April 16, 2014, BankPlus executed an Assignment of Note, Deed of Trust and Related Instruments, which assigned to Calvert, personally, the BankPlus note. The document stated that, although the original principal amount of the note was

for $978,287.17, the current payoff balance was $424,329.55 as of April 18, 2014. Calvert accordingly executed an identical assignment of the BankPlus note to The People's Bank.

Calvert emailed Landrum, Sharpe, and Clark on April 17, 2014, stating that he would be funding the payoff of the BankPlus note. He attached a summary of the terms of the loan he was providing to Landrum and Sharpe, which provided for a principal amount of $758,248 – this included (1) the balance of the BankPlus note, (2) the $75,000 cash advanced as an interest and loan fee reserve to The People's Bank, (3) $60,000 in prior cash advances, (4) $12,444 in interest accrued through April 17, 2014 on unspecified loaned funds, (5) $171,488 in unpaid professional fees, (6) an appraisal fee, and (7) a 2% loan fee of $8,487 – and a 12% interest rate (to increase to 18% in case of default), all to be paid on or before April 18, 2016. The principal and interest together amounted to $951,147. Additionally, future professional fees would be added to the amount due on a monthly basis. Clark drafted a loan document with these terms – the Note – which Jill Landrum and Marna Sharpe executed as members of Livingston and Michael Sharpe and David Landrum executed in their individual capacities.

Despite acknowledging the conflict of interest created by Calvert's new role as lender and lacking signed conflict waivers, Calvert continued to bill Livingston for consulting services. On May 24, 2014, David Landrum emailed Calvert asking if Calvert wanted to loan Defendants $40,000 and increase his lien in order to allow Chestnut to pay for a design firm's $39,545 fee for designing a water and sewer

system for the Project. The Project was not going to be able to receive necessary development permits without these design plans. Calvert responded on May 27, 2014 that he would be willing to loan them another $40,000 if both Landrums and both Sharpes would execute a conflict-of-interest waiver acknowledging that Calvert's priority would be serving his own interest as lender. Calvert also asked for the waiver to be effective as of the earlier date he provided funding and to apply to future transactions as well. Clark drafted an Acknowledgment and Waiver of Conflict of Interest in Join Representation of Multiple Clients, which David Landrum and Jill Landrum signed on May 28, 2014. (*See id.* Ex. 32, at 178-79 (ECF pagination).) Calvert thereafter wired $40,000 to Livingston. However, Michael Sharpe emailed David Landrum on June 2, 2014 stating that he did not feel comfortable borrowing money from Calvert and would not sign any conflict waiver with Mark Calvert. (*Id.* Ex. 34, at 181 (ECF pagination).) This was at least in part due to an unresolved disagreement over equity shares and control between the Landrums and Sharpes in Livingston and the Project. Sharpe also said he would wire to Chestnut the $40,000 for the sewer and water design plans.

On June 3, 2014, Calvert emailed Sharpe regarding the "partnership issues" between Sharpe and Landrum. Due to this dispute and Sharpe's unwillingness to sign a conflict waiver, Calvert said that he needed to resign "as the company's financial advisor" and asked for the return of his $40,000 loan. (*Id.* Ex. 35, at 187 (ECF pagination).) However, Calvert indicated that he would reconsider if the Sharpes would execute the conflict waiver. Sharpe returned the Calvert's loaned

$40,000. But on June 6, 2014, at David Landrum's request, Calvert wired $39,545 to Livingston. The Landrums individually executed a promissory note on June 10, 2014 for $40,000 ($39,545 in principal plus $455 as a loan fee), payable to Calvert with 18% annual interest.

Effective July 26, 2014, Jill Landrum and Marna Sharpe executed a Second Amended and Restated Memorandum of Understanding and Amendment to Operating Agreement, by which Marna Sharpe's membership interest in Livingston became a controlling 51% and Jill Landrum's became 49%. (*See id.* Ex. 40, at 199-207 (ECF pagination).) On August 1, 2014, Jamie Martin wrote to the Landrums to notify them that the Sharpes had designated Mike Bollenbacher as (1) their agent for all matters regarding Livingston and its subsidiaries and (2) manager of Chestnut. Marna Sharpe then sold half of her interest in Livingston to Mike Bollenbacher, and they both created B&S MS Holdings, LLC ("B&S") – in which they each held 50% interest – to replace their personal membership positions in Livingston.

On December 2, 2014, Calvert emailed Michael Sharpe, Mike Bollenbacher, and David Landrum after having been copied on a number of emails from Landrum and having been called by Landrum for help with both the Project and the change in control over Livingston. Calvert expressed that he saw an "un reconcilable conflict of interest" in any arrangement by which he provided consulting services to Landum alone or to Livingston and its members and could not participate further "without a complete waiver and hold harmless agreement." (*Id.* Ex. 43, at 212-13

(ECF pagination).) He stated that he would therefore again resign from providing any financial advice to Livingston or any of its members and would only be a lender from that date forward. Notwithstanding this conflict, he also advised Landrum to retain counsel and limit his personal expenses and shared that he wanted to help in any way he could.

The next day, Calvert emailed Bollenbacher and Sharpe to follow up on a phone call, had earlier that morning, regarding Landrum's cash flow and whether Landrum, personally, or Livingston should be covering certain expenses. Calvert reiterated that he needed a "letter to waive the conflict" but that it did "not need to be formal." (*Id.* at 216.) Bollenbacher responded that Jamie Martin was working to "get in place a waiver of conflict before we move forward." (*Id.* at 215.) Martin sent Calvert an email on behalf of Bollenbacher and Sharpe – with Bollenbacher and Sharpe copied – that (1) acknowledged that Sharpe and Landrum had guaranteed significant obligations to various lenders, including Calvert and Cascade, and (2) provided the following conflict-of-interest waiver:

> [Sharpe, Bollenbacher, Livingston, and Chestnut] waive any conflict of interest that may arise from this day forward with respect to (a) [Calvert and Cascade] providing personal financial advice and services to the Landrums with respect to their personal finances and an analysis as to how the Landrums can meet the obligations to [creditors], (b) [Calvert and Cascade] providing advice and assistance for the development of a common plan among [Sharpe, Bollenbacher, Livingston, Chestnut,] and the Landrums with respect to the negotiations with [creditors]; and (c) [Calvert and Cascade] serving as a lender to some or all of [Sharpe, Bollenbacher, Livingston, Chestnut,] and the Landrums under the [Cascade] loan, and [Calvert and Cascade] moving forward as a personal

advisor to the Landrums; provided, however, [Sharpe, Bollenbacher, Livingston, and Chestnut] do not waive any conflict of interest with respect to [Calvert's] involvement in any renegotiation of the current agreements between the Landrums and some or all of [Sharpe, Bollenbacher, Livingston, and Chestnut] or the management of [Livingston] or its subsidiaries; further provided, however that in the event that [Calvert] and [Sharpe, Bollenbacher, Livingston, and Chestnut] become adverse to each with respect to the [Cascade] loan or otherwise, then [Sharpe, Bollenbacher, Livingston, and Chestnut] do not consent to [Calvert's] continued advice and services to the Landrums; and further provided that [Sharpe, Bollenbacher, Livingston, and Cascade] do not waive any defenses with respect to the enforcement of the [Cascade] loan that existed and/or arose at the time the [Cascade] loan was made.
This conflict waiver will remain in effect through December 31, 2014, and can only be extended by [Sharpe, Bollenbacher, Livingston, and Cascade] by written notice to [Calvert and Cascade].

(*Id.* Ex. 44, at 218-19 (ECF pagination).) Calvert ran this waiver by his personal attorney, Michael J. Avenatti, on December 5, 2014, and notified the Landrums that his attorney found the waiver acceptable.

Bollenbacher emailed Calvert at Sharpe's behest on December 16, 2014 to report his analysis of the expected monthly expenses for the following twelve months. He asked Calvert to review the numbers and give him a call. The evidentiary record does not detail any communications or decision-making for nearly all of 2015. But Cascade's invoices for services rendered and billed document his continued involvement through January, February, April, May, June, August, September, October, November, and December of 2015.

On December 8, 2015, Martin emailed Calvert, copying Andy Clark, Sharpe, and Bollenbacher, stating that Sharpe, Livingston, and Chestnut had "requested a loan pay off letter and loan payoff numbers and [were] ready to proceed with closing of other financing." (*Id.* Ex. 46, at 225 (ECF pagination).)  Martin asked Calvert to provide this information and documentation as soon as possible and noted that Sharpe, Livingston, and Chestnut would "need to obtain from [Calvert] an Authority to Cancel the attached Deed of Trust and a Termination of Lien with respect to the attached Notice of Lien." (*Id.*)  This requested release apparently dealt with the construction of a chapel as part of the Project.  Calvert responded that he was under no obligation to release a portion of the land subject to the lien and would like a complete solution for his being paid in full.  He said he would consider a partial release but had not received the actual square footage of the land to be released so that he could calculate a release price.  He also cautioned that any partial release would need to be approved by The People's Bank.

Bollenbacher emailed Calvert on December 28, 2015 to provide what he thought to be the necessary information to calculate a release price.  He divided the outstanding debt owed to Calvert – $997,276 at the time – by the total square footage of the Project's land – 962,545 square feet – and rounded to $1.05 per square foot.  This led to $34,221.60 as a fee to release 32,592 square feet of land.  Calvert disagreed with the calculations, maintaining that fair market value – about $6 per square foot – rather than the debt secured was the appropriate measure for a release fee and that the amount of land to be released was inadequate because it did

not account for abutting roads and parcels that would not be developed.  Calvert suggested they meet in person to resolve this dispute.

On March 17, 2016, Calvert and Bollenbacher executed a letter Confirmation of Understanding regarding the purpose of a meeting that would occur later that day (and the purpose of any future meetings related to the debt held by Calvert). The letter "confirm[s] that the consulting services agreement [between Cascade and Livingston] is terminated effective December 31, 2015" and "that [Cascade] is acting solely as a lender to Livingston and . . . [Cascade] is not providing consulting services to Livingston with respect to the resolution of the loan or the disposition of any of the collateral pledged in support of the loan or the unpaid consulting fees and expenses." (*Id.* Ex. 47, at 231-32 (ECF pagination).)  Chestnut had located financing and purchasers for portions of the Project referred to as the Building I Parcel and the Cottages.  Bollenbacher thus had traveled to Seattle, Washington to meet with Calvert to discuss a release of those tracts with proceeds to be put towards Defendants' indebtedness on the Note.  However, Calvert refused to meet with Bollenbacher or to discuss a partial release of any portion of the Project's land unless Livingston, Chestnut, and Sharpe executed a forbearance agreement regarding the Note.

Discussions over the terms of a forbearance agreement lasted through April 26, 2016, when the Agreement was signed.  Bollenbacher and Robert Yamamoto – a later investor in the Project who had purchased a parcel referred to as the Lake Property – negotiated with Calvert over the terms of the Agreement.  Bollenbacher

and Yamamoto said they had interested buyers for additional lots and asked to include release prices calculated at the same rate previously settled upon for the Chapel and Building I (they had apparently agreed to $3.04 per square foot). They also asked for any agreement to be an extension of the Note rather than a forbearance, because Jamie Martin advised them that the latter would connote their default and limit future financing options. Calvert said he required a steeper rate for release of those plots and disagreed with Martin's opinion regarding the impact of forbearance versus extension. He refused to modify the terms of the Note and proposed a forbearance agreement with terms including (1) a payment of $114,632 by June 30, 2016 for release of the Chapel and Building I parcels, (2) a partial payment of $800,000 by December 31, 2016, (3) an interest rate of 12% from April 1, 2016 through June 30, 2016, (4) an interest rate of 18% commencing July 1, 2016, (5) monthly interest payments to The People's Bank, (6) granting Calvert a second lien on Yamamoto's Lake Property, and (7) the completion of certain parcel appraisals before the execution of a forbearance agreement and any release of those parcels. (Mot. Summ. J. Ex. 48, at 235, ECF No. 74-2 (ECF pagination).) He also noted that a forbearance agreement would allow him to continue assisting them with the Project.

On April 16, 2016, Calvert emailed Bollenbacher, Yamamoto, Sharpe, and Landrum, also copying his personal attorney Mike Gearin (who drafted the Agreement), to remind them that the Note had matured on March 31, 2016 and that although he had been in discussion with Bollenbacher and Yamamoto, he did not

believe they had made much progress.  Calvert said that a forbearance agreement would need to be signed by the start of the coming week or he would not travel to Mississippi to meet with banks in order to assist with obtaining new financing.  He cautioned that "time is not your friend," "[y]ou need to get me out and replace me with a cheaper cost of capital," and "I will start foreclosure if we do not have a sign[ed] agreement by April 31, 2016."  (*Id.* at 243-44.)

On April 20, 2016, Yamamoto responded to Calvert regarding a draft forbearance agreement to question the inclusion of $54,175 in fees charged to and advances made to Landrum, personally.  Calvert initially responded that he had no problem with excluding this sum from debt guaranteed by B&S, but changed his mind to say B&S must sign for it, and then conceded that this sum might be only attributable to Landrum, personally.  The Agreement, executed April 26, 2016 by Livingston, Chestnut, B&S, Sharpe, the Landrums, and Cascade, noted that those fees and advances were to David Landrum, personally.  It included all of the terms previously proposed by Calvert with two slight changes: the December 31, 2016 payment was reduced from $800,000 to $750,000 and June 1, 2016 – rather than July 1, 2016 – became the date the 18% interest rate kicked in.  The Agreement also purported to release Calvert and Cascade from any claims Defendants might have against them and provided that all indebtedness incurred thereunder – $1,030,370 on the Note as of March 31, 2016 plus additional accrued interest – was due March 18, 2018.

Defendants did not make the $114,632 payment by June 30, 2016, as provided for in the Agreement. Bollenbacher says that this was because he and Calvert were involved in considerable negotiation about the appropriate amount for a release fee for the Chapel and Building I parcels.[3] On July 11, 2016, Jamie Martin emailed Calvert recounting that Calvert had asked her to prepare a First Amendment to the Agreement regarding the Chapel and Building I parcels. Martin attached a draft, which was already signed by Bollenbacher, the Landrums, and the Sharpes, and which Calvert executed. The First Amendment to the Agreement altered the provision requiring payment of $114,632 by June 30, 2016 to instead provide for a payment of $38,402 by July 15, 2016 for the Chapel and a payment of $76,230 by September 15, 2016 for Building I. It also established that no event of default occurred under the Agreement (presumably as a result of the missed June 30, 2016 payment).

Cascade received the Chapel payment on July 15, 2016 and the Building I payment on September 14, 2016 and released those parcels as agreed. However, Defendants failed to pay Calvert $750,000 by December 31, 2016, as provided for in the Agreement. This placed Defendants in default of the Agreement. However, Cascade did not file this lawsuit until December 1, 2017. In the interim, Livingston entered into an agreement with a prospective buyer for the sale of other parcels of the Project, which were still encumbered by the Note. Bollenbacher says the

---

[3] However, the Agreement seemed to already establish that payment of $114,632 by June 30, 2016 (which is the sum of separate $38,402 and $76,230 payments for the release of the Chapel and the Building I parcels, respectively) was agreed upon for release of the parcels.

proceeds of this sale would have been sufficient to pay off the principal debt on the original BankPlus note. Livingston attempted to pay off the debt held by The People's Bank, but Calvert refused to allow for the release of the subject parcels and instructed The People's Bank to similarly refuse to provide Livingston with a payoff. The prospective buyer withdrew and the sale was lost.

Despite multiple instances in which Calvert purported to resign from his representation of Livingston and persons related to the Project's development, invoices reflect that he continued to bill Livingston through dates as late as June 26, 2018 – long after this lawsuit was filed. His billing entries cover any and all tasks related to Livingston and the Project, including formulating and negotiating his loans to Defendants, his preparations for filing this lawsuit, and his time spent negotiating a potential settlement of this lawsuit. Cascade charged rates of $350 to $450 per hour for most services and amassed fees and expenses totaling over $300,000 from July 2012 through April 2017.[4]

Cascade maintains that, as of September 30, 2018, it was owed $1,470,070 under the terms of the Agreement. Moreover, interest continues to accrue at a rate of 18% annually, and Cascade says the Agreement provides for attorneys' fees related to recouping this overdue sum. On October 4, 2018, Cascade and Calvert filed the instant Motion for Summary Judgment. The Motion argues the undisputed record demonstrates (1) that Defendants are in breach of the Agreement, (2) that Defendants have no viable defenses precluding entry of

---

[4] Invoices from April 2017 through June 2018 reflect about another $100,000 of fees and expenses billed to Livingston.

judgment in Cascade's favor, and (3) that Defendants' counterclaims and third party claims for breach of fiduciary duty and breach of the duty of good faith and fair dealing fail as a matter of law. Defendants disagree, contending that the Note and Agreement are legally defective and, alternatively, material issues of fact preclude summary judgment as to any party's claims.

## II. DISCUSSION

<u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

"A genuine dispute of material fact means that 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the evidence presented by the nonmovant "'is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671

F.3d 512, 516 (5th Cir. 2012) (quoting *Anderson*, 477 U.S. at 249).  In deciding whether summary judgment is appropriate, the Court views the evidence and inferences in the light most favorable to the nonmoving party.  *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

a. <u>Analysis</u>

The parties agree that Mississippi state law provides the substantive law governing the claims at issue in this case.[5]  Because each of the claims at issue – Plaintiff's breach of contract claim and Defendants' breach of fiduciary duty and breach of the duty of good faith and fair dealing claims – operate independently of the others, the Court will address each in turn.

1. <u>Breach of Contract</u>

A plaintiff asserting a breach of contract claim has the burden to prove, by a preponderance of the evidence, "1. the existence of a valid and binding contract; and 2. that the defendant has broken, or breached it."  *Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221, 1224-25 (Miss. 2012).  To determine whether the Note and the Agreement at issue are valid contractual agreements, this Court applies the law of contracts. Under Mississippi law, "[t]he elements of a valid contract are: (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and

---

[5] This Court proceeds in diversity under 28 U.S.C. § 1332.  Thus, the law of the forum state, Mississippi, applies. *Capital City Ins. Co. v. Hurst,* 632 F.3d 898, 902 (5th Cir. 2011); *Smith v. Goodyear Tire & Rubber Co.,* 495 F.3d 224, 228 (5th Cir. 2007). State law is determined by looking to the decisions of the state's highest court. *St. Paul Fire & Marine Ins. Co. v. Convalescent Servs., Inc.,* 193 F.3d 340, 342 (5th Cir. 1999).

(6) no legal prohibition precluding contract formation." *Rotenberry v. Hooker,* 864

So. 2d 266, 270 (Miss. 2003) (citation and quotation marks omitted).

The evidence in the record establishes the prima facie validity of the Note

and the Agreement. Cascade, Livingston, Sharpe, and Landrum signed both

contractual documents (and Chestnut also signed the Agreement), Cascade loaned

Livingston money on the Note and forewent justiciable legal action on the

Agreement, both documents provide for payments to be made at specific dates, the

parties all have the legal capacity to contract, the parties appear to have agreed to

the terms and conditions stated in the documents, and neither document contracts

for an illegal purpose. The record evidence similarly establishes that Defendants

are in breach of the Agreement because they did not make a required payment of

$750,000 to Cascade by December 31, 2016. *Cf. Hill v. Consumer Nat'l Bank*, 482

So. 2d 1124, 1128 (Miss. 1986) ("The affidavit [– which stated that the note was

executed by Hill, was held by the Bank, was not paid when due and had not been

paid as of the date of the affidavit –] established prima facie the Bank's entitlement

to judgment.")

In response, Defendants make numerous arguments against the

enforceability of the Note and the Agreement.[6] First, Defendants contend that the

Note "on its face represents claimed sums not payable to Cascade." (Mem. Supp.

Resp. Opp. 12, ECF No. 89.) Defendants assert that a conflict of interest prohibits

Cascade from collecting professional fees and interest on the original BankPlus

---

[6] Defendants have inadequately briefed the following arguments. Most arguments
are made in a single sentence and few make any reference to caselaw, let alone
caselaw that is directly on point.

note, other claimed advances are unsubstantiated, and the loan fee and appraisal fee are without legal basis. Defendants cite no case law in support of this argument. Defendants would essentially have Cascade justify after-the-fact the sums of money Defendants already agreed to pay. Their chance to challenge the appropriateness of including these sums of money was before the Note was signed. This argument is without merit.

Second, Defendants argue that "the Note references Collateral . . . described in Exhibit A, but there is no Exhibit A" and "the Note recites that it is secured by a 'Notice of Lien' . . . [b]ut Mississippi has no lien for consulting fees, loans, origination or appraisal fees." (*Id.* at 13.) They also argue, as to the Agreement, that it "references a legal description in Exhibit A, but there is no Exhibit A;" it references a Loan Agreement and Loan Documents, but these are not submitted; and it "references the 'Indebtedness' subject to the [Agreement] as described in Exhibit B, but there is no Exhibit B." (*Id.* at 14-15.) Even if true, none of these supposed infirmities undercut the validity of the contractual agreement to pay sums of money now overdue.

Although the legal description of the collateral property was meant to be attached in an absent "Exhibit A," the Note and the Agreement still adequately identify the property by the referenced Deed of Trust filed in the public records of Madison County, Mississippi. *See Woodruff v. Thames*, 143 So. 3d 546, 554 (Miss. 2014) ("For an incorporation by reference to be effective, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.

A reference to another document must be clear and unequivocal, and the terms of the incorporated document must be known or easily available to the parties.") And most importantly, none of these terms were material to the promise to pay money in exchange for a loan and forborne legal action. Defendants do not seriously argue that they cannot ascertain the terms and conditions of the Note and the Agreement. *See Leach v. Tingle*, 586 So. 2d 799, 802 (Miss. 1991) ("A contract is sufficiently definite 'if it contains matters which would enable the court under proper rules of construction to ascertain its terms.'") And for good reason: the factual record establishes that Defendants understood the terms of the contracts they were signing. They consulted their own legal counsel at each turn.

Third, Defendants maintain that language in the Note and the Agreement to the effect that future professional fees and unearned interest would be added to the amount due contravenes the legal requirement that a promissory note be for a "sum certain." (*Id.* at 13-14 (citing *Terry v. Superintendent of Educ.*, 52 So. 2d 13, 14 (Miss. 1951)).) *Terry* addressed whether an agreement to lease land could stipulate to quantities of cotton as rent payment instead of money. The Mississippi Supreme Court held that such an agreement was enforceable between the signing parties. The fact that payment in cotton rendered the instrument nonnegotiable was of no matter. *Terry* noted that a promissory was "a written promise to pay to the payee a certain sum on a certain day," 52 So. 2d at 14, but it is not clear why the Note and the Agreement would need to be negotiable in order to be enforceable between the signatories.

Fourth, Defendants assert that Chestnut did not sign the Note or the Agreement and therefore Chestnut is not responsible for either. Defendants claim "Chestnut is not a valid signatory to the [Agreement] because David Landrum was not its managing member and had no authority to sign on its behalf," (Mem. Supp. Resp. Opp. 15, ECF No. 89), and reference minutes from Livingston's annual meeting, held February 27, 2018, in which Bollenbacher, Jill Landrum, and David Landrum all confirmed that Bollenbacher has been "the managing member of all entities and that [B&S] has [had] majority vote" since October 2014. (Resp. Opp. Ex. 11, at 1, ECF No. 88-13.) But the record contains numerous legal documents executed by David Landrum from October 2014 through 2017 in the capacity of Chestnut's manager, and Chestnut's registration with the Mississippi Secretary of State's Office listed David Landrum as manager in its 2017 Annual Report. Even if Defendants could create an issue of fact as to David Landrum's actual authority to sign for Chestnut, there is ample evidence to establish Landrum's apparent authority[7] and Chestnut's subsequent ratification[8] of his signature (and Defendants

---

[7]     "Apparent authority exists when a reasonably prudent
          person, having knowledge of the nature and the usages of
          the business involved, would be justified in supposing,
          based on the character of the duties entrusted to the
          agent, that the agent has the power he is assumed to
          have." Mississippi law imposes a three-prong test for
          determining if apparent authority exists:
                    (1) acts or conduct by the principal indicating the
                    agent's authority; (2) reasonable reliance by a third
                    party upon those acts or conduct; and (3)
                    detrimental change in position by the third party
                    as a result of such reliance.
*Newsome v. Peoples Bancshares*, __ So. 3d __, 2018 WL 4811892, at *7 (Miss. Oct. 4, 2018) (citations omitted).

do not argue anything other than Landrum's lack of actual authority). Chestnut's other members signed the Agreement and the First Amendment to the Agreement in other capacities and were aware that Landrum signed for Chestnut. Chestnut was plainly party to and signed the Agreement, by which Chestnut purported to assume responsibility for the Note. (*See* Am. Compl. Ex. B, at 11, ECF No. 6-2.)

Fifth, Defendants argue that no person authorized to act on behalf of Livingston executed the Note. The uncontroverted evidence establishes that Marna Sharpe explicitly authorized Jill Landrum to sign the Deed of Trust on behalf of Livingston and that Marna Sharpe and Jill Landrum – the only members of Livingston at the time – both signed the Note.

Sixth, Defendants maintain, without elaboration, that the Note and the Agreement "were procured by duress through the self-dealing and egregious conflict of interest on the part of Cascade and Calvert, and in breach of the fiduciary duty of Cascade and Calvert to Livingston . . . and in violation of duties of good faith and fair dealing . . . ." (Mem. Supp. Resp. Opp. 14, 16, ECF No. 89.) "Duress strikes at whether a party actually consented to a contract." *Estate of Davis v. O'Neill*, 42 So.

---

8    Ratification does not arise by operation of law; rather,
       "[a] person ratifies an act by (a) *manifesting assent* that
       the act shall affect that person's legal relations, or (b)
       conduct that justifies a *reasonable assumption* that the
       person so consents." It is true that, under some
       circumstances, a principal's *inaction* can result in
       ratification, but only where the principal has notice that
       others will infer from his silence that he intends to
       manifest his assent to the act.
*Northlake Dev. L.L.C. v. BankPlus*, 60 So. 3d 792, 797 (Miss. 2011) (citations omitted).

3d 520, 525 (Miss. 2010) (citing *Duckworth v. Allis–Chalmers Mfg. Co.*, 150 So. 2d 163, 165 (Miss. 1963)). "[T]o invalidate a contract on grounds of economic duress, the complaining party must establish: (1) that the dominant party threatened to do something which he had no legal right to do; and (2) that the wrongful threat overrode the volition of the victim and caused him to enter an agreement against his free will." *Bailey v. Estate of Kemp*, 955 So. 2d 777, 783 (Miss. 2007) (quoting *Kelso v. McGowan,* 604 So.2d 726, 732 (Miss. 1992)). Defendants have not identified any threatened conduct which Cascade had no legal right to do. If anything, the uncontroverted evidence demonstrates that Defendants consented to the Note and the Agreement, no matter how reluctantly. The alleged conflict of interest does not change this calculus. As to asserted defenses rooted in Cascade's alleged breach of fiduciary duty and breach of the duty of good faith and fair dealing, Defendants have not identified any caselaw supporting the existence of such an affirmative defense, and the Court is not otherwise aware that they exist. The Court acknowledges, however, that equitable relief – including the voiding of a contract – is available for Defendants' breach of fiduciary duty counterclaim. *See Tyson v. Moore*, 613 So. 2d 817, 823-24 (Miss. 1992) ("Any transaction in which an attorney may have taken undue advantage of the client is voidable."); *Victory Lane Prods., LLC v. Paul, Hastings, Janofsky & Walker, LLP*, 409 F. Supp. 2d 773, 781 (S.D. Miss. 2006) ("Under the holdings in *Tyson,* if Victory Lane prevails on its breach of fiduciary duty claim against Defendants, it will be entitled to void its

contract with Paul Hastings and seek return of the $60,000.00 in legal fees paid to Paul Hastings.").

Cascade is accordingly entitled to summary judgment on its breach of contract claim regarding the Note and the Agreement, as modified by the First Amendment to the Agreement.

2. <u>Breach of the Duty of Good Faith and Fair Dealing</u>

Defendants counterclaim against Cascade and make a third party claim against Calvert for breach of the duty of good faith and fair dealing. Cascade and Calvert argue that these claims fail as a matter of law because Defendants do not allege conduct that would substantiate such a claim. The Court agrees.

"[E]very contract contains an implied covenant of good faith and fair dealing." *Merchants & Planters Bank of Raymond v. Williamson*, 691 So. 2d 398, 405 (Miss. 1997). "The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." *Gen. Motors Acceptance Corp. v. Baymon*, 732 So. 2d 262, 269 (Miss. 1999) (citations omitted). Mississippi's codified version of the Uniform Commercial Code similarly defines good faith to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing." Miss. Code Ann. § 75-1-201(20). "However, in performing a contract, the parties are not prevented from 'protecting their respective economic interests' or from asserting their rights in the event of a default." *Baymon*, 732 So. 2d at 269 (quoting *Williamson,* 691 So.2d at 405).

Defendants rely on the same conflict of interest that is the basis of their breach of fiduciary duty claims to substantiate Cascade and Calvert's alleged lack of good faith and fair dealing in contracting for the Note, the Agreement, and the First Amendment to the Agreement, and in carrying out those contracts. But it is clear that the duty of good faith and fair dealing "entails a significantly lower standard of care than that owed in the fiduciary context." *Williamson*, 691 So. 2d at 405. Defendants' failure to make prescribed payments under the Note gave rise to the Agreement, and their failure to make payments prescribed under the Agreement gave rise to this lawsuit. Defendants do not allege Cascade and Calvert to have been factually dishonest in their contractual dealings. Rather, Defendants claim that Cascade and Calvert took advantage of their leverage over Defendants' circumstances by virtue of the fiduciary relationship between Cascade and Defendants. The unfairness at issue is solely the result of Cascade and Calvert's dual role as lender and fiduciary advisor. This is not an issue of contractual good faith and fair dealing.

Cascade and Calvert are accordingly entitled to summary judgment against the counterclaim and third party claim for breach of the duty of good faith and fair dealing. These claims will be dismissed.

3. <u>Breach of Fiduciary Duty</u>

Defendants assert a counterclaim against Cascade and a third party claim against Calvert for breach of fiduciary duty. "The elements of a claim for breach of fiduciary duty are (1) a fiduciary relationship, and (2) its breach." *Peters v. Metro.*

*Life Ins. Co.*, 164 F. Supp. 2d 830, 835 (S.D. Miss. 2001) (citing Restatement (Second) of Torts § 874 & comment b). "Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character." *Mullins v. Ratcliff*, 515 So. 2d 1183, 1191 (Miss. 1987) (citing *Hendricks v. James,* 421 So. 2d 1031, 1041 (Miss. 1982)). "While Mississippi law does not require any 'magic words,' there must be evidence that both parties understood that a special trust and confidence was being reposed." *Mabus v. St. James Episcopal Church*, 884 So. 2d 747, 758 (Miss. 2004) (citing *Lowery v. Guar. Bank & Trust Co.,* 592 So. 2d 79, 84 (Miss. 1991)).

Cascade and Calvert's Motion for Summary Judgment does not contest Defendants' characterization of their relationship as fiduciary, and it is not clear Cascade and Calvert even dispute that they breached their fiduciary duties to Defendants. The Court finds that there is sufficient evidence in the record to establish factual issues with regard to both elements of the breach of fiduciary duty claims.[9]

---

[9] "To determine if a fiduciary relationship was created in a commercial transaction, we look to 'whether (1) the parties have shared goals in each other's commercial activities, (2) one of the parties places justifiable confidence or trust in the other party's fidelity, and (3) the trusted party exercises effective control over the other party.'" *Saucier v. Peoples Bank of Biloxi*, 150 So. 3d 719, 725 (Miss. Ct. App. 2014) (quoting *AmSouth Bank v. Gupta*, 838 So. 2d 205, 216 (Miss. 2002)).

However, Cascade and Calvert raise the following affirmative defenses to Defendants' counterclaims and third party claims: (1) claims related to the Note are time-barred by the applicable statute of limitations, (2) Defendants are contractually barred from asserting these claims against Cascade and Calvert by virtue of the Agreement, (3) Defendants' counterclaims and third party claims are barred by the doctrine of waiver and ratification, and (4) Defendants' claims are barred by the doctrine of quasi-estoppel.  Although Defendants have not organized their briefing so as to directly respond to any of these arguments, they have addressed these issues, at least tangentially, through their shotgun approach to responding.  Moreover, Cascade and Calvert bear the burden of establishing these defenses by means of uncontroverted evidence.

    i.    <u>Statute of Limitations</u>

The statute of limitations for breach of fiduciary duty is three years under section 15-1-49 of the Mississippi Code.  *Ranking v. Am. Gen. Fin., Inc.*, 912 So. 2d 725, 726 (Miss. 2005).  Cascade and Calvert argue that, at least as to the Note, any claims Defendants may have had accrued no later than April 18, 2014, the date the Note was executed.  And because Defendants did not file these claims until they filed their Answer, Counterclaims, and Third Party Claims on January 19, 2018, any claims related to executing the Note are time-barred.  But Cascade and Calvert would have the Court parse Defendants' counterclaims and third party claims into many discrete claims pertaining to distinct events.  This characterization of Defendants' claims ignores the ongoing nature of the alleged fiduciary relationship

between Cascade/Calvert and Defendants (which may even have continued beyond the date Cascade filed this lawsuit given the professional fees charged through at least June 2018) and the multiple alleged breaches. Moreover, Defendants' allegations paint a picture in which they did not realize the harm that Cascade and Calvert had caused them until long after they had signed the Note. Given the conflicting evidence in the record as to when any breach of fiduciary duty claims may have accrued, the Court declines to grant summary judgment at to breach of fiduciary duty claims on the basis of the statute of limitations.

    ii.   <u>The Agreement's Exculpatory Clause</u>

Paragraph 8 of the Agreement provides that Defendants

> release, acquit and forever discharge [Cascade], its
> predecessors in interest and all [Cascade's] past and
> present officers, directors, attorneys, affiliates, employees
> and agents, of and from any and all claims, demands,
> liabilities, indebtedness, breaches of contract, breaches of
> duty, or of any relationship, acts, omissions, misfeasance,
> malfeasance, causes of action, defenses, offsets, debts,
> sums of money, accounts, compensation, contracts,
> controversies, promises, damages, costs, losses and
> expenses, of ever type, kind, nature, description or
> character, whether known or unknown, suspected or
> unsuspected, liquidated or unliquidated, each as though
> fully set forth herein at length (each, a "Released Claim"
> and collectively, the "Released Claims"), that
> [Defendants] now have or may acquire.

(Am. Compl. Ex. 2, at 8, ECF No. 6-2.) Cascade argues that this provision of the Agreement is enforceable because "the law will enforce [contracts] absent proof of fraud, mistake or overreaching." (Mem. Supp. Mot. Summ. J. 30, ECF No. 75 (quoting *Chantey Music Pub., Inc. v. Malaco, Inc.*, 915 So. 2d 1052, 1055 (Miss.

2005)).) Defendants maintain that enforcing this provision so as to bar their breach of fiduciary duty claims would be unconscionable.

Although "[t]he right of persons to contract is fundamental to [Mississippi] jurisprudence," it goes without saying "that provisions in contracts contrary to public policy . . . are unenforceable." *First Nat'l Bank of Vicksburg v. Caruthers*, 443 So. 2d 861, 864 & n.3 (Miss. 1983). "The law does not look with favor on contracts intended to exculpate a party from the liability of his or her own negligence. . . ." *Turnbough v. Ladner*, 754 So. 2d 467, 469 (Miss. 1999). "[S]uch agreements are subject to close judicial scrutiny and are not upheld unless the intention of the parties is expressed in clear and unmistakable language." *Id.* (citations omitted). "The wording of an exculpatory agreement should express as clearly and precisely as possible the extent to which a party intends to be absolved from liability." *Id.* (citations omitted). "Failing that, we do not sanction broad, general 'waiver of negligence' provisions, and strictly construe them against the party asserting them as a defense." *Id.* (citations omitted).

The clause at issue in the Agreement would "release, acquire and forever discharge" Cascade from (in addition to many other things) any and all "breaches of duty" that Defendants "now have or may acquire." This language broadly waives any negligence claims that Defendants may have had against Cascade. But it does not contemplate (and the Agreement does not otherwise acknowledge) the asserted fiduciary nature of the consulting relationship between Cascade and Defendants. Although exculpatory clauses are typically forward-looking waivers, the same

concerns undergirding the need for clear and precise language are present in this context, where Cascade maintains multiple, conflicting relationships with Defendants as consultant and lender. The Court finds the language in this clause to be too general a waiver of negligence for it to reasonably contemplate a breach of fiduciary duty.

Additionally, and alternatively, the Court determines, in making an *Erie*[10] guess, that the Mississippi Supreme court would find exculpation for breach of fiduciary duty in an ongoing fiduciary relationship contravenes public policy, and that the release clause is therefore void. The Mississippi Supreme Court has recognized that "it is well within the chancellor's authority to void parts of a contract as violative of public policy." *Hastings v. Guillot*, 825 So. 2d 20, 24 (Miss. 2002). However, "[t]he standard for what constitutes a violation of public policy is not always clear; thus invalidating a clause as violation of public policy is a judicial power easily abused and should be done with an abundance of caution." *Natchez Reg'l Med. Ctr. v. Quorum Health Res., LLC*, 879 F. Supp. 2d 556, 563 (S.D. Miss. 2012) (citing *Cappaert v. Junker*, 413 So. 2d 378, 381 (Miss. 1982)). "[A]n exculpatory contract should not be invalidated on public policy grounds unless the clause 'is prohibited by the Constitution, a statute, or condemned by some decision of the courts construing the subject matter." *Id.* at 565 (citing *Cappaert*, 413 So. 2d at 381).

The Mississippi Supreme Court does not appear to have specifically addressed contractual clauses exculpating liability for breach of fiduciary duties.

---

[10] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

Thus, the Court's "primary obligation is to make an *Erie* guess as to how the [Mississippi Supreme Court] would decide the question before [it]." *Keen v. Miller Envtl. Grp., Inc.*, 702 F.2d 239, 243 (5th Cir. 2012) (first alteration in original) (citations omitted). "When making an *Erie* guess, [the Court's] task is to attempt to predict state law, not to create or modify it." *Id.* (citation omitted). The Court therefore "consider[s] [Mississippi] Supreme Court cases that, while not deciding the issue, provide guidance as to how the [Mississippi] Supreme Court would decide the question before [it]." *Id.* at 244 (second and third alterations in original) (citation omitted).

In considering decisions of Mississippi courts construing the subject matter, "the Mississippi Supreme Court has focused specifically on how the public, which is protected by a host of judicially-imposed common-law legal duties but is not a 'party' to the contract, would be impacted by one private party's attempt to limit its liability to another private party." *Natchez Reg'l Med. Ctr.*, 879 F. Supp. 2d at 565. For example, in *Cappaert v. Junker*, the Mississippi Supreme Court considered a hold-harmless provision in a residential lease agreement. 413 So. 2d 378. The court invalidated the lease provision because it "contravene[d] long established common law rules of tort liability that exist in the landlord-tenant relationship." *Id.* at 382. In reaching this conclusion, the court explained,

> [I]t cannot be said that such exculpatory clauses are "purely a private affair" or that they are "not a matter of public interest." The real question is whether we should sanction a technique of immunizing lessors of residential units within a multi-family dwelling complex, from liability for personal injuries sustained by a tenant, which

– 35 –

> injuries result from the lessor's own negligence in
> maintaining the "common areas"; particularly when the
> technique employed destroys the concept of negligence
> and the standard of affirmative duty imposed upon the
> landlord for protection of the tenant.

*Id.* at 381-82 (quoting *McCutcheon v. United Homes Corp.,* 79 Wash. 2d 443, 486

P.2d 1093, 1097 (1971)). Thus, "the supreme court looked beyond the rights of the

parties vis-a-vis the clause to examine how 'sanctioning' the exculpatory clause

would nullify the typical duties of a landlord and thus have the potential to injure

other members of the unsuspecting public." *Natchez Reg'l Med. Ctr.*, 879 F. Supp.

2d at 566.

Addressing a lawyer's fiduciary duty of loyalty to his or her clients, the

Mississippi Supreme Court has said that breach of this duty "is characterized as

'constructive fraud' because proof of intent is irrelevant. . . . The objective standard

rests on this rationale: Because a breach of loyalty injures both the client's interests

and the legal profession's integrity, the gravity of the harm cannot be cured by good

faith." *Tyson*, 613 So. 2d at 823 (citations omitted). Common law imposes fiduciary

duties on certain relationships in order to allow for trust in and reliance upon the

expertise of certain persons and institutions. The legal profession is, for obvious

reasons, the first context that comes to mind. But financial institutions and lenders

frequently form fiduciary relationships with their clients, however informal. *See,*

*e.g.*, *Am. Bankers Ins. Co. of Fla. v. Alexander*, 818 So. 2d 1073, 1085 (Miss. 2001),

*overruled on other grounds by Capital City Ins. Co. v. G.B. "Boots" Smith Corp.*, 889

So. 2d 505 (Miss. 2004), and *Wyeth-Ayerst Labs v. Caldwell*, 905 So. 2d 1205 (Miss.

2005); *Lowery*, 592 So. 2d at 83-85. And guardians and conservators owe fiduciary duties to their wards. *See, e.g. Jackson v. Jackson*, 732 So. 2d 916, 921 (Miss. 1999); *Estate of Bodman v. Bodman*, 674 So. 2d 1245, 1249-50 (Miss. 1996).

To sanction the exculpatory provision at issue in the Agreement would be to encourage all fiduciaries to contract away the responsibilities that society has seen fit to impose upon them. If a single lawyer's breach of his or her fiduciary duties injures the legal profession as a whole, then society has no interest in encouraging such injuries by exculpating the responsible lawyer. Indeed, the Mississippi Supreme Court has characterized the breach of the fiduciary duty of loyalty – the very duty at issue in the present case – as constructive fraud. Under these circumstances, the Court concludes that the Mississippi Supreme Court would find the Agreement's release of liability clause void because it contravenes public policy.[11]

### iii. Waiver and Ratification

Cascade and Calvert argue that Defendants waived their breach of fiduciary duty claims when they signed the Agreement and the First Amendment to the Agreement. In support, they cite to *Holland v. The Peoples Bank & Trust Co.*, 3 So. 3d 94 (Miss. 2008). *Holland* held that the plaintiff's renewal of a defaulted note

---

[11] The Mississippi Supreme Court has explained that unconscionable agreements may be remedied in one of three ways: "[T]he court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." *Covenant Health & Rehab. of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So. 3d 695, 700 (Miss. 2009) (quoting Miss. Code Ann. § 75-2-302). The Court does not find invalidation of the entire contract to be a necessary consequence of having deemed this single release clause void.

constituted a waiver of all claims against the bank, including for breach of fiduciary duty. However, the fiduciary duty at issue in *Holland* was alleged to have been imposed by an escrow agreement that was supposedly part of the loan agreement. The fiduciary duty at issue in the present case is unrelated to the debtor/creditor relationship between Defendants and Cascade. This fiduciary relationship derives from the separate consulting services agreement, which was not "remedied" or otherwise contractually by the Agreement or the First Amendment to the Agreement.

The basis for finding waiver in *Holland* – that the plaintiff had full knowledge of the defenses to the defaulted note when he executed a new note payable at a future date – is not clearly applicable here, where a fiduciary relationship existed independently of the contracts at issue. When the plaintiff in *Holland* negotiated a workout agreement to the defaulted note with the bank, no fiduciary relationship continued to exist between those parties. The Court accordingly declines to find that, as a matter of summary judgment, Defendants waived their breach of fiduciary duty claims against Cascade and Calvert.

iv.   Quasi-Estoppel

Cascade and Calvert contend that Defendants should be estopped from repudiating the Note, the Agreement, and the First Amendment to the Agreement after having already benefitted from those contracts. Cascade and Calvert cite to *Bailey v. Estate of Kemp* for the proposition that "estoppel forbids one from both gaining a benefit under a contract and then avoiding the obligations of that same

contract." 955 So. 2d at 782. Again, as already determined with regard to the waiver argument, Defendants' breach of fiduciary duty claims do not derive from the Note, the Agreement, or the First Amendment to the Agreement; these claims are premised upon a fiduciary duty arising from the professional consulting agreement. The Court similarly finds this argument to be without merit.

## III. CONCLUSION

The Court has determined that no material issues of facts preclude finding Defendants in breach of the Note and the Agreement. The Court has also determined that Defendants' counterclaim and third party claim for breach of the duty of good faith and fair dealing should be dismissed. However, controverted factual issues preclude granting summary judgment on Defendants' counterclaim and third party claim for breach of fiduciary duty.[12]

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [74] Motion for Summary Judgment filed by Plaintiff Cascade Capital Group, LLC and Third-Party Defendant Mark Calvert is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is **GRANTED** as to (1) Cascade's breach of contract claim on the Note and the Agreement and (2) Defendants' counterclaim and third party claim for breach of the duty of good faith and fair dealing. Defendants' counterclaim and third party claim for breach of the duty of good faith and fair dealing are therefore

---

[12] As a point of clarity, the Court would note that it has not made an affirmative finding that either a fiduciary relationship existed between Cascade and Defendants or Cascade breached any such resulting duty. Defendants did not, themselves, move for summary judgment on their counterclaims and third party claims.

dismissed.  Summary judgment on Defendants' counterclaim and third party claim for breach of fiduciary duty is **DENIED**.

        **SO ORDERED AND ADJUDGED** this the 4th day of February, 2019.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE