# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

CASCADE CAPITAL GROUP, LLC                                    PLAINTIFF

v.                                              CAUSE NO. 3:17cv952-LG-MTP

LIVINGSTON HOLDINGS, LLC;
CHESTNUT DEVELOPERS, LLC;
DAVID LANDRUM; and MICHAEL L.
SHARPE                                                       DEFENDANTS

                                  AND

LIVINGSTON HOLDINGS, LLC;
CHESTNUT DEVELOPERS, LLC; and
MICHAEL L. SHARPE                                      COUNTERCLAIMANTS

v.

CASCADE CAPITAL GROUP, LLC                             COUNTERDEFENDANT

                                  AND

LIVINGSTON HOLDINGS, LLC;
CHESTNUT DEVELOPERS, LLC; and
MICHAEL L. SHARPE                                  THIRD PARTY PLAINTIFFS

v.

MARK CALVERT                                      THIRD PARTY DEFENDANT

## FINDINGS OF FACT AND CONCLUSIONS OF LAW UPON ISSUES TRIED WITHOUT A JURY PURSUANT TO FED. R. CIV. P. 52

THIS CAUSE came before the Court on September 23-25, for a trial without

a jury pursuant to Federal Rule of Civil Procedure 52. The Court previously

granted summary judgment and judgment on the pleadings in favor of Plaintiff

Cascade Capital Group, LLC ("Cascade") on its breach of contract claim, having

determined that Defendants Livingston Holdings, LLC ("Livingston"), Chestnut

Developers, LLC ("Chestnut"), Michael L. Sharpe, and David Landrum defaulted on

the Promissory Note (Ex. D-3) and the Forbearance Agreement (Ex. D4), as

amended by the First Amendment to the Forbearance Agreement (Ex. D-5). (*See*

Memorandum Opinion and Order Granting in Part and Denying in Part Motion for

Summary Judgment, ECF No. 111; Order Granting Judgment on the Pleadings as

to Defendant David Landrum, ECF No. 112.)

The only issues remaining before the Court are: (1) whether

Counterclaimants/Third-Party Claimants Livingston, Chestnut, and Sharpe have

proven their counterclaims/third-party claims for a breach of fiduciary duty by

Cascade and Mark Calvert and, if so, (2) to what remedy are Livingston, Chestnut,

and Sharpe entitled.[1]

After careful consideration of the testimony presented at trial and the

exhibits introduced into evidence, the Court finds by clear and convincing evidence[2]

---

[1] David Landrum is a named defendant in this lawsuit, but he did not join in the counterclaim or file a separate counterclaim. He instead answered the complaint by admitting all the allegations. Judgment on the pleadings was accordingly entered against him. Despite having conceded the allegations against him and having elected to pursue no counterclaim or third-party claim, Mr. Landrum, through his attorney, Harrison Barnes, sought to participate at the trial. The Court determined that Mr. Landrum had no basis for participating at the trial of his co-defendants' counterclaims and third-party claims (unless he were to be called as a witness). Moreover, Mr. Barnes was not able to cite or direct the Court to any case, rule, or statute tending to stand for the proposition that an individual not a party to a counterclaim should be permitted to participate at its trial. Accordingly, Mr. Barnes was excluded as a participant at the trial.

[2] Although Cascade and Calvert argue that the clear and convincing burden of proof standard applies to finding both the existence of a fiduciary duty and the breach of that duty, under Mississippi law this heightened standard applies only to the determination of whether a fiduciary duty exists. *See AmSouth Bank v. Gupta*, 838

that Cascade breached its fiduciary duty of loyalty to Livingston, Chestnut, and Sharpe. As such, Livingston, Chestnut and Sharpe are entitled to equitable relief as more fully set out below.

## FINDINGS OF FACT

This lawsuit arises out of Defendants' default on a Promissory Note ("the Note") and a subsequent Forbearance Agreement ("the Agreement"). The Note reflected one of several loans acquired by Defendants to fund the re-development of the "Old Town of Livingston" in Madison County, Mississippi. David Landrum Chestnut, and Livingston began this redevelopment project in 2008. Chestnut's sole member is Livingston. Livingston's members were originally Marna Sharpe (Michael Sharpe's wife) and Jill Landrum (David Landrum's wife), but in October 2014, Mike Bollenbacher[3] became Livingston's third member when Marna transferred her interest to B&S MS Holdings, LLC ("B&S"), whose members were Marna and Bollenbacher. Chestnut acquired the land and the plans for a multi-use development. In 2011, a loan was secured from BankPlus to fund a portion of the Project. Chestnut provided BankPlus with a promissory note in the principal amount of $978,287.17, secured by a Deed of Trust. (Exs. D-9, D-11.)

_____

So. 2d 205, 216 (Miss. 2002). In the opinion of the Court, the preponderance of the evidence standard applies to a finding that such a duty was breached. Regardless, the Court finds that the evidence in this case is sufficient to satisfy the clear and convincing standard for both duty and breach.

[3] Mike Bollenbacher had been involved in the Town of Livingston development since 2010 by virtue of a Joint Venture Agreement between his firm, Los Robles, and Livingston.

Due in part to a stalled post-recession real estate development market, Livingston sought help recapitalizing the project through either more equity or a new borrower. In July of 2012, Livingston engaged the consulting services of Cascade.[4] Mark Calvert, the sole member of Cascade, is an accountant and certified turnaround professional ("CTP") with many years of experience in finance, distressed debt, and restructuring. He described Cascade as a small consulting firm that helps clients buy, sell, and restructure businesses. (Tr. 31.) Calvert testified that Cascade has restructured $6 billion in loans for approximately 60 clients across its eighteen years of existence. According to Calvert, as of 2013, Cascade had restructured more than $4 billion in debt in the prior five years. Cascade "specialize[s] in the more complicated cases" because the firm is "pretty good at modeling out what the possibilities are, what the options are, and are able to come up with the recommendations for the . . . management companies to make a decision on what to do with . . . real estate projects." (Tr. 31-32.) Calvert emphasized that his "strength is to teach, to train, to educate and to provide recommendations." (Tr. 37.) Calvert testified that he gave Sharpe and Landrum a copy of his CV and Cascade's company profile and "shared with them the nature and extent of the work [he] had performed in the past." (Tr. 32.) The testimony established that Calvert is an experienced restructuring and turnaround advisor and held himself out as such to Sharpe and Landrum. (Tr. 111-12.)

---

[4] Neither party has located a signed copy of the engagement letter. Cascade produced an unsigned copy of the supposedly agreed-upon engagement letter. Regardless, invoices detail fees for services beginning July 25, 2012, including an initial meeting on July 26, 2012.

Calvert testified that the engagement letter specified that Sharpe and Landrum – not Livingston and Chestnut – were his clients, and that his objective in consulting with and representing Sharpe and Landrum was to restructure the Livingston Township project's debt in order to buy them time to weather the economic downturn. Cascade's invoices and bills, however, were sent to Livingston – even those encompassing personal loans made only to Landrum and fees for consulting with the Landrums on their personal finances. (Tr. 57-58, 77, 304.) Calvert later offered conflicting testimony, stating that he started representing Livingston, too, once Mike Bollenbacher took the reins of Livingston. (Tr. 100.) In the course of advising on the Livingston project, Calvert became intimately acquainted with the financial details of Sharpe and Landrum's lives. (Tr. 33, 66, 121-22.) He also described his consulting relationship with Sharpe and Landrum as a "fiduciary" relationship. (Tr. 49, 77, 95.)

Calvert interacted primarily with Landrum. (Tr. 37-38.) Initially, this was because Sharpe was a passive investor in the project (Landrum managed the project on the ground), he did not have a college education or a background in real estate, and he was located in California. (Tr. 110, 114, 164.) Before June 2014 – by which point Sharpe no longer trusted the Landrum and Calvert's decision-making – Sharpe heavily relied on Calvert's advice and expertise. (Tr. 113.) Moreover, most of Calvert's input and advice was offered to Landrum, and Landrum made many decisions with limited input from Sharpe, until Jill Landrum ceded a majority ownership share of Livingston to Marna Sharpe and B&S Holdings. Later, Calvert

continued to consult and interact primarily with Landrum despite knowing that he did not have controlling authority over Livingston. (*See, e.g.*, Tr. 62-63; Ex. D-59.)

The BankPlus note matured December 15, 2013, and Livingston was unable to pay off the balance of $468,193.53. David Landrum met with Terry Howard, a BankPlus loan officer, on December 16, 2013 to request a renewal of the loan. On December 23, 2013, at Landrum's request, Calvert loaned Livingston $30,000 to help Livingston renew the loan for 90 days, until February 15, 2014. (Ex. D-25.) Livingston (through Chestnut) paid BankPlus $60,500, reducing the extension loan balance to $412,329.94. (Exs. D-10, D-26.)

On January 28, 2014, again at Landrum's request, Calvert agreed to loan Livingston another $30,000, this time for Livingston to make a deposit on cottage designs for the Livingston Township development. The $30,000 loan was contingent upon the prior loan, current loan, and $95,144.11 in unpaid consulting fees being consolidated into a single note, personally guaranteed by Landrum and Sharpe, and secured with a lien on the development's cottage lots. (Exs. D-27, D-28.) Landrum accepted these terms on both his and Sharpe's behalf.

On March 7, 2014, Thomas Hudson, General Counsel for BankPlus, wrote Chestnut, Landrum, and Sharpe to inform them of their default on the BankPlus note. Hudson cautioned that legal action would be taken against them to collect on the note if the $418,664.03 in overdue principal, interest, and late fees was not paid by March 27, 2014. (Ex. D-29.) Calvert contacted Terry Howard and attempted to

work out a way to refinance the BankPlus note. BankPlus ultimately rejected Calvert's refinancing proposals.

Calvert then reached out to Chevis Sweatman, President of The People's Bank of Biloxi ("People's Bank"), with whom Calvert had a preexisting professional relationship, to inquire about obtaining a personal loan with which to buy out the BankPlus note. (Ex. D-33.) On April 14, 2014, Calvert came to an agreement with People's Bank, whereby Calvert would borrow $425,000 from People's Bank, and the loan would be secured, in part, by Calvert's collateral assignment of the BankPlus note and Deed of Trust (once those documents were assigned to him by BankPlus). (Ex. D-37.)

On April 16, 2014, BankPlus executed an Assignment of Note, Deed of Trust and Related Instruments, which assigned to Calvert, personally, the BankPlus note and Deed of Trust. (Ex. D-40.) The document stated that, although the original principal amount of the note was for $978,287.17, the payoff balance was $424,329.55 as of April 18, 2014. Calvert accordingly executed an identical assignment of the BankPlus note and Deed of Trust to People's Bank.

Calvert emailed Landrum, Sharpe, and Andy Clark (Landrum's personal attorney) on April 17, 2014, stating that he would be funding the payoff of the BankPlus note. (Ex. D-39.) He attached a summary of the terms of the loan he was providing to Landrum and Sharpe, which stated a principal amount of $758,248 – this included (1) the balance of the BankPlus note, (2) the $75,000 cash advanced as an interest and loan fee reserve to People's Bank, (3) $60,000 in prior cash

advances, (4) $12,444 in interest accrued through April 17, 2014 on unspecified loaned funds, (5) $171,488 in unpaid professional fees, (6) an appraisal fee, and (7) a 2% loan fee of $8,487 – and a 12% interest rate (to increase to 18% in case of default), all to be paid on or before April 18, 2016. The principal and interest together amounted to $951,147.[5] Additionally, future professional fees were to be added to the amount due on a monthly basis. Clark drafted a loan document with these terms – the Note – which Jill Landrum and Marna Sharpe executed as members of Livingston and Michael Sharpe and David Landrum executed in their individual capacities.[6]

Calvert acknowledged that his purchase of the BankPlus note created a conflict of interest between his continuing role as fiduciary advisor through Cascade and his new role as lender. (Tr. 48-49, 90-93; Exs. D-41, D-42.)[7] Calvert testified that the ethical canons for a CTP provide that a CTP's "duty is solely to the client, and he or she should . . . strive to remain independent from other affiliations that could compromise his or her judgment or result in the appearance of compromise."

---

[5] According to Mike Bollenbacher, who was not aware of Calvert's purchase of the BankPlus note until after it had occurred, he could have gotten his own conventional loan at 4.5% interest and purchased the BankPlus note. (Tr. 352.) He implied in his testimony that he would not have turned around and charged Livingston 12 or 18% interest.

[6] It appears that at the time Sharpe and Landrum agreed for Calvert to buy the BankPlus note, the Sharpes did not have their own legal representation. Andy Clark represented only Landum and, perhaps, Livingston (by virtue of Landrum's role as Livingston's manager). Nothing suggests that Calvert knew Andy Clark did not represent Sharpe.

[7] The evidence seems to establish that Calvert, individually, purchased the BankPlus note, not Cascade. This is notwithstanding the conflict of interest waiver, drafted by Andy Clark, representing that Cascade was acting as both lender and financial advisor. (Tr. 92; Ex. D-41.)

(Tr. 53; Ex. D-65.)  Furthermore, a CTP "shall avoid conflicts of interest and the appearance of conflict of interest."  (Tr. 53; Ex. D-65.)  Although Calvert sought a signed conflict waiver from Sharpe and Landrum and said he would not continue to consult on the Livingston project without one, Calvert continued to provide – and bill for – consulting services despite Sharpe's refusal to sign a conflict waiver.  (Tr. 49-50; Ex. D-2.)

In May 2014, Landrum again asked Calvert to loan the Livingston project additional money in exchange for an increased lien.  This time, it was $40,000 to pay for the design of the development's water and sewer system plans.  (Ex. D-41.) The project would have been unable to obtain the necessary development permits without these design plans.  Calvert agreed to loan the project another $40,000 if both Landrums and both Sharpes would execute a conflict-of-interest waiver acknowledging that Calvert's priority would be serving his own interest as lender. Calvert also asked for the waiver to be retroactively effective to the earliest date he loaned money and to also apply to future transactions.  (Ex. D-42.)  Andy Clark drafted a waiver, which the Landrums signed but Sharpe refused to sign.

By June 2014, at the very latest, Calvert was aware of a rift between Sharpe and Landrum.  Sharpe refused to personally guarantee additional loans, and Calvert emailed Sharpe on June 3, 2014 regarding the "partnership issues" between Sharpe and Landrum.  (Tr. 95; Ex. D-46.)  Calvert wrote that he needed to resign from advising Livingston due to Sharpe's unwillingness to execute a conflict waiver and the dispute between Sharpe and Landrum.  He said he would reconsider,

though, if Sharpe signed a conflict waiver. Sharpe refused to sign. Calvert nonetheless continued to provide consulting services to Landrum and wired $40,000 to Landrum, personally. (Tr. 56-58; Exs. D-17, D-19.)

Effective July 26, 2014, Jill Landrum and Marna Sharpe executed a Second Amended and Restated Memorandum of Understanding and Amendment to Operating Agreement, by which Marna Sharpe's membership interest in Livingston became a controlling 51% and Jill Landrum's became 49%. (Ex. P-48.) On August 1, 2014, Jamie Martin wrote to the Landrums to notify them that the Sharpes had designated Mike Bollenbacher as (1) their agent for all matters regarding Livingston and its subsidiaries and (2) manager of Chestnut. (Ex. P-49.) Calvert said that he also received a copy of Jamie Martin's letter. (Tr. 62-63.) Marna Sharpe then sold half of her 51% interest in Livingston to Mike Bollenbacher, and they created B&S MS Holdings, LLC – in which they each held 50% interest – to replace their personal membership positions in Livingston. Calvert continued to consult with Landrum, individually, and bill Livingston for his time.

In December 2014, Calvert again informed Sharpe, Bollenbacher, and Landrum that he saw an irreconcilable conflict of interest in his providing consulting services to any of them individually while they remained in disagreement over the direction of the project.[8] (Ex. D-53.) He, again, purported to resign and, again, continued providing and billing for consulting services. (Tr.

---

[8] He obtained, from Jamie Martin, a very limited conflict of interest waiver on behalf of Sharpe and Bollenbacher, which the Court finds to be essentially meaningless given how many caveats and limitations are built into the wording. (*See* Ex. D-55.)

308.)  Cascade's invoices for services rendered and billed document Calvert's continued involvement through January, February, April, May, June, August, September, October, November, and December of 2015.

On December 8, 2015, Jamie Martin emailed Calvert, on behalf of Livingston, requesting a loan payoff letter and loan payoff numbers to release parcels of land to be used for the construction of a chapel and Building I.  (Tr. 313; Ex. D-57.)  Calvert responded stating that he was under no obligation to release a portion of the land subject to his lien and desired a complete, global solution.  This would require that Calvert be "paid in full" before he would agree to a partial release.  (Tr. 100-101; Ex. D-57.)  Bollenbacher proposed $1.05 per square foot of land to be released – the outstanding debt of $997,276 divided by the 962,545 square feet of total encumbered land.  Bollenbacher testified that this was the method for calculating partial release fees used by Livingston's other lenders.  (Tr. 312.)  However, Calvert would not agree, instead maintaining that fair market value, or $6 per square foot, was the appropriate price per square foot for release of the chapel parcel.  (Ex. D-58.)  Bollenbacher eventually determined that the best way to discuss the release fee was for him to travel to Seattle to meet with Calvert, in person.  (Tr. 311, 315.)

Bollenbacher and Robert Yamamoto[9] arrived at the Cascade office to meet with Calvert on March 17, 2016.  (Tr. 315-16.)  Upon their arrival, Calvert handed them a letter outlining the purpose of any future meeting related to the debt held by

---

[9] Robert Yamamoto is a later investor in the Project who had purchased a parcel referred to as the Lake Property.  He was also Bollenbacher's business partner in the Los Robles firm.

Calvert and said he would not talk to them about anything until they signed the document. (Tr. 315.) The letter stated, among other things, that the loan reflected by the Note would mature in two weeks, on March 31, 2016. (Ex. D-59.) It also sought to establish an agreed-upon summary of prior events. The evidence at trial tends to show that certain claimed representations of fact in this letter appear to be at best, misleading, and explicitly intended for Calvert's legal benefit. For instance, the letter states that Cascade "has not provided significant consulting services" to Livingston since Bollenbacher and B&S acquired an interest in Livingston. (Ex. D-59.) However the evidence demonstrates that Calvert billed Livingston for work apparently done since Bollenbacher's involvement through B&S. The letter also states that Cascade's role "has been limited [to] assisting with possible financing[,] responding to requests for information[,] and/or consents relating to the BankPlus loan held by [Cascade]" and "the consulting service agreement [with Livingston] is terminated effective December 31, 2015." (Ex. D-59.) Again, Cascade's own billing records bely this representation.

Significantly, the letter included a section titled "Confirmation of Understanding," which laid out numerous stipulations, including the following:

> 2) BORROWER ACKNOWLEDGES THAT [CASCADE] IS ACTING SOLELY AS A LENDER TO LIVINGSTON AND THAT LIVINGSTON'S MANAGEMENT IS RESPONSIBLE FOR ALL DECISIONS REGARDING THE COMPANY'S BUSINESS AFFAIRS. . . . [CASCADE] IS NOT PROVIDING CONSULTING SERVICES TO LIVINGSTON WITH RESPECT TO THE RESOLUTION OF THE LOAN OR THE DISPOSITION OF ANY OF THE COLLATERAL PLEDGED IN

> SUPPORT OF THE LOAN OR THE UNPAID
> CONSULTING FEES AND EXPENSES.
>
> . . . .
>
> 5) [CASCADE] PRIOR TO THIS MEETING HAS ADVISED
> THE BORROWER THAT THE LOAN MATURES ON
> MARCH 31, 2016 AND THAT [CASCADE] DESIRE[S]
> TO BE PAID IN FULL FOR ALL AMOUNTS DUE
> UNDER THE LOAN AND ALL UNPAID FEES AND
> EXPENSES ON THAT DATE.

(Ex. D-59.)

Bollenbacher found Calvert's demand unfair, but he felt as though he did not have an alternative given the Note's impending maturity. (Tr. 315-16.) He signed the letter, and they came to an agreed-upon release price of $114,632 (or $3.04 per square foot) for the chapel and the Building I parcels. They also began discussing what to do about the impending due date of the Note. Bollenbacher and Jamie Martin requested an extension of the Note. Bollenbacher and Yamamoto also told Calvert that they had lined up interested buyers for additional parcels and asked for release prices calculated at the same rate as the chapel and Building I. Calvert said additional release prices would have to be higher and refused to modify the Note, instead demanding a forbearance agreement. (Tr. 320, 328-30; Ex. P-56.) In later discussions over the demanded forbearance agreement, Calvert threatened to cancel an upcoming trip to Mississippi for purposes of meeting with a bank to get Livingston new financing (Tr. 327-29), despite having explicitly foresworn any ongoing consulting relationship after December 31, 2015 in the March 17, 2016 letter.

On April 26, 2016, Livingston, Chestnut, B&S, Sharpe, the Landrums, and Cascade executed the Forbearance Agreement, which included the following terms: (1) a payment of $114,632 to Calvert by June 30, 2016 for release of the Chapel and Building I parcels, (2) a partial payment of $750,000 by December 31, 2016, (3) an interest rate of 12% from April 1, 2016 through May 31, 2016, (4) an interest rate of 18% commencing June 1, 2016, (5) monthly interest payments to The People's Bank, and (6) granting Calvert a second lien on Yamamoto's Lake Property. (Ex. D-4.) The Agreement also purported to release Calvert and Cascade from any claims Defendants might have against them and provided that all indebtedness incurred thereunder – $1,030,370 on the Note as of March 31, 2016 plus additional accrued interest – was due March 18, 2018. (Ex. D-4.) Calvert also noted, via email, that the Agreement would allow him to continue assisting everyone with the Livingston Township project (again, despite attestations to the contrary in the March 17, 2016 letter).

Defendants did not make the $114,632 payment by June 30, 2016, as provided for in the Agreement. On July 11, 2016, Jamie Martin emailed Calvert recounting that Calvert had asked her to prepare a First Amendment to the Agreement, which addressed the lack of payment for the chapel and Building I parcels. (Ex. D-62.) Jamie Martin attached a draft, which was already signed by Bollenbacher, the Landrums, and the Sharpes, and which Calvert thereafter executed. The First Amendment to the Agreement altered the provision requiring payment of $114,632 by June 30, 2016 to instead provide for a payment of $38,402

by July 15, 2016 for the chapel parcel and a payment of $76,230 by September 15, 2016 for the Building I parcel. (Ex. D-5.) It also established that no event of default occurred under the Agreement (presumably as a result of the missed June 30, 2016 payment).

Cascade received the Chapel payment on July 15, 2016 and the Building I payment on September 14, 2016 and released those parcels, as agreed. However, Livingston, Chestnut, and Sharpe failed to pay Calvert $750,000 by December 31, 2016, as provided for in the Agreement. This placed Defendants in default of the Agreement, and Calvert threatened to foreclose. (Ex. P-247.)

Cascade did not file this lawsuit until December 1, 2017. In the interim, Livingston entered into an agreement with a prospective buyer, Crosstown Development, LLC, for the sale of certain cottage and commercial property parcels, which were still encumbered by the Note. (Tr. 323-24.) Bollenbacher testified that the proceeds of this sale would have been sufficient to pay off People's Bank, to whom Calvert had assigned the Deed of Trust. Livingston attempted to pay off People's Bank, but Calvert refused to allow for the release of the subject parcels and instructed People's Bank to similarly refuse to provide Livingston with a payoff figure. (Tr. 101-104, 323-24.) Crosstown Development, LLC withdrew its offer and the sale was lost. A subsequent offer for the same properties was never even put before Calvert because the offeror withdrew after Bollenbacher explained the necessary contingencies to any agreement.

On November 13, 2017, eighteen days before filing his civil complaint, Calvert filed a document titled "Modification and Correction of Deed of Trust" in the Madison County, Mississippi property records.  (Tr. 61; Ex. D-23.)  This document (1) corrected a supposed scrivener's error on the March 25, 2014 Deed of Trust executed by Chestnut and Cascade, (2) stated that Chestnut acknowledged increases in the debt owed since the original's execution and Chestnut's default on the Note and the Agreement, and (3) admitted the continuing validity of the Note, the Agreement, and the Deed of Trust.  (Ex. D-23.)  It was signed by David Landrum, only, indicating that he signed as Manager of Chestnut.  (Tr. 62; Ex. D-23.)  Calvert testified that he relied on the fact that Landrum was still listed as Chestnut's manager on the Mississippi Secretary of State's website, but he also admitted to knowing that Bollenbacher – not Landrum – was in charge of Livingston and Chestnut by August 1, 2014.  (Tr. 62-65.)

Cascade's invoices reflect that Calvert continued to bill Livingston long after Cascade filed this lawsuit.  These billing entries purportedly covered any and all tasks related to the Livingston project, including drafting and negotiating loans to Livingston, Sharpe, and Landrum, his preparations for filing this lawsuit, and his time spent negotiating a potential settlement.  Cascade charged rates of $350 to $450 per hour for most services and amassed fees and expenses totaling over $300,000 from July 2012 through April 2017.  Invoices from April 2017 through June 2018 reflect about another $100,000 of fees and expenses billed to Livingston.

Invoices for his time spent working to collect on the Note and the Agreement continued through at least July 31, 2019.

## CONCLUSIONS OF LAW

Because this Court proceeds in diversity under 28 U.S.C. § 1332, the law of the forum state – Mississippi – applies. *Capital City Ins. Co. v. Hurst*, 632 F.3d 898, 902 (5th Cir. 2011); *Smith v. Goodyear Tire & Rubber Co.,* 495 F.3d 224, 228 (5th Cir. 2007). State law is determined by looking to the decisions of the state's highest court. *St. Paul Fire & Marine Ins. Co. v. Convalescent Servs., Inc.,* 193 F.3d 340, 342 (5th Cir. 1999).

The claims tried before the Court are Livingston, Chestnut, and Sharpe's counterclaim and third-party-claim for breach of fiduciary duty against Cascade and Calvert. "The elements of a claim for breach of fiduciary duty are (1) a fiduciary relationship, and (2) its breach." *Peters v. Metro. Life Ins. Co.*, 164 F. Supp. 2d 830, 835 (S.D. Miss. 2001) (citing Restatement (Second) of Torts § 874 & comment b). "Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character." *Mullins v. Ratcliff*, 515 So. 2d 1183, 1191 (Miss. 1987) (citing *Hendricks v. James,* 421 So. 2d 1031, 1041 (Miss. 1982)). "While Mississippi law does not require any 'magic words,' there must be evidence that both parties understood that a special trust and confidence was being reposed." *Mabus v. St. James Episcopal Church*, 884 So. 2d 747, 758

(Miss. 2004) (citing *Lowery v. Guar. Bank & Trust Co.,* 592 So. 2d 79, 84 (Miss. 1991)).

I.   <u>CASCADE OWED A FIDUCIARY DUTY TO LIVINGSTON, CHESTNUT, AND SHARPE</u>

The existence of a fiduciary relationship is a question of fact that must be established by clear and convincing evidence. *AmSouth Bank v. Gupta*, 838 So. 2d 205, 216 (Miss. 2002).

> "Fiduciary relationship" is a very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one person trusts in or relies upon another. A fiduciary relationship may arise in a legal, moral, domestic, or personal context, where there appears on the one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed. Additionally, a confidential relationship, which imposes a duty similar to a fiduciary relationship, may arise when one party justifiably imposes special trust and confidence in another, so that the first party relaxes the care and vigilance that he would normally exercise in entering into a transaction with a stranger.

*Lowery,* 592 So.2d at 83 (internal quotation marks and citations omitted). "To determine if a fiduciary relationship was created in a commercial transaction, we look to 'whether (1) the parties have shared goals in each other's commercial activities, (2) one of the parties places justifiable confidence or trust in the other party's fidelity, and (3) the trusted party exercises effective control over the other party.'" *Saucier v. Peoples Bank of Biloxi*, 150 So. 3d 719, 725 (Miss. Ct. App. 2014) (quoting *Gupta*, 838 So. 2d at 216.  All three elements must be present to find the existence of a fiduciary relationship in a commercial transaction.

There were two separate relationships between Cascade and Livingston, Chestnut, and Sharpe. The first was the consultant/consultee relationship that began in 2012. The second was the creditor/debtor relationship beginning in 2014. It is undisputed that the consulting agreement between Cascade, Livingston, Sharpe, and Landrum created a fiduciary relationship. Indeed, Cascade was explicitly hired to be an expert advisor in financial restructuring, upon whom Sharpe, Landrum, and Livingston could rely. As an advisor, Calvert – acting through Cascade – was privy to the most intimate financial details of Sharpe and Landrum's lives. He knew the confidential details of Livingston and Chestnut's financial circumstances, and took the lead in Livingston's attempt to refinance the BankPlus debt.

Significantly, Calvert, himself, repeatedly referred to his own "fiduciary" duty towards Sharpe, Landrum, and Livingston. Calvert is a CTP, whose Code of Ethics unequivocally provides, "A member shall serve his or her client independently, competently and in a professional manner." (Ex. D-65, at 2.) Elaborating upon the meaning of independent service, Canon 2.2 states, "A member's duty is solely to the client and he or she should strive to remain independent of other affiliations that could compromise his or her judgment or result in the appearance of compromise. . . . A member shall avoid conflicts of interest and the appearance of conflicts of interest." (Ex. D-65, at 2.) This canon creates a duty akin to the duty of loyalty owed by lawyers to clients, guardians to wards, and corporate directors to shareholders: a CTP is obligated to operate in the best interest of his or her client.

The clear and convincing trial evidence demonstrates that by means of the consulting arrangement, Cascade and Calvert entered into a fiduciary relationship with – and thus owed a duty of loyalty to – Sharpe, Landrum, and Livingston. Insofar as the creditor/debtor relationship is concerned, it is not clear that Livingston, Chestnut, and Sharpe argue that a fiduciary duty arose from this circumstance. It is clear, however, that fiduciary relationships can and do arise between creditor and debtor. *See, e.g., Am. Bankers Ins. Co. of Fla. v. Alexander*, 818 So. 2d 1073, 1085 (Miss. 2001), *overruled on other grounds by Capital City Ins. Co. v. G.B. "Boots" Smith Corp.*, 889 So. 2d 505 (Miss. 2004), and *Wyeth-Ayerst Labs v. Caldwell*, 905 So. 2d 1205 (Miss. 2005); *Lowery*, 592 So. 2d at 83-85; *Saucier*, 150 So. 3d at 725-28. But any relevant fiduciary duties owed as lender would be subsumed within the duty of loyalty owed as financial advisor. Therefore, the Court sees no reason to determine the scope of any fiduciary duties that may or may not have arisen by virtue of the creditor/debtor relationship.

## II.     CASCADE REPEATEDLY BREACHED ITS FIDUCIARY DUTY OF LOYALTY

The totality of the evidence adduced at trial compels the Court to conclude that Cascade breached its fiduciary duty of loyalty to Livingston, Chestnut, and Sharpe. Cascade was hired to act in the best interests of Sharpe, Landrum, Livingston, and Chestnut, and Calvert's ethical duties mandate that Cascade operate in his client's best interests. The trial record supports the finding that on numerous occasions Cascade did not do so. Several examples of instances in which the fiduciary duty was breached are noted below

A. Collateralizing Personal Debt

Calvert may have prevented the BankPlus foreclosure of the 22 acres of the Livingston Township project by purchasing the BankPlus note,[10] but what he subsequently did with that debt in the Note and the Agreement cannot possibly be understood to be in the best interest of his clients. First, Calvert took unsecured debt – namely, his unpaid professional fees, various loans, and interest on both – and collateralized that debt by further encumbering the 22 acres of land which had previously only secured the BankPlus note.[11] In the Note, what had been $424,329.55 of secured debt more than doubled to $951,147. The Agreement then restated the secured debt owed to be $1,030,370 as of March 31, 2016.

Both documents also provide that all future professional fees would be rolled into the outstanding, secured debt. This – combined with draconian interest rates[12] – meant that the amount of secured debt would continue to balloon, making timely repayment less and less likely. Although rolling Calvert's unsecured debt into the secured BankPlus note may not have been unlawful, the decision cannot be characterized as acts taken in his clients' best interests. Instead, the commingling of Calvert's invoices for professional fees with the secured note worked to his own

---

[10] It appears that Bollenbacher could have acquired financing just the same to purchase the BankPlus note, and without the imposition of penal interest rates, but Landrum was the managing member of Livingston at the time and apparently elected not to reach out to Bollenbacher.

[11] This is essentially akin to a lender combining someone's home mortgage and personal loans into one single loan secured by their home.

[12] Calvert essentially treated the loan as if Livingston was already in default to begin with, charging interest at a rate of 12%, rising to 18% in case of default. The BankPlus note's interest rate in case of default was 11.5%.

benefit and to the detriment of his clients. Intentional or not, Calvert (acting through Cascade) took commercial advantage of the very circumstances which his clients had hoped his professional counsel would prevent.

B. Leveraging the Inflated Collateralized Debt to the Detriment of Livingston, Chestnut, and Sharpe

Cascade breached its fiduciary duty to Livingston, Chestnut, and Sharpe by wielding the secured debt reflected in the Note and Agreement to leverage its position as lender to Livingston, Chestnut, and Sharpe. When Bollenbacher flew to Seattle to meet with Calvert to negotiate a price for the partial release of the chapel and Building I parcels, Calvert refused to speak with Bollenbacher until he signed a letter – a letter that misrepresented the circumstances and events leading up to the meeting by neatly distinguishing between Cascade's conduct as advisor and lender. In reality, Cascade (through Calvert) mixed the two roles freely and repeatedly continued to provide consulting services after purporting to resign because of reoccurring conflicts of interest. Calvert clearly recognized the conflict and repeatedly tried to purge himself through releases.[13] He acted as both lender and advisor, and he took sides in the dispute between his clients, continuing to advise Landrum despite the known rift between Landrum and Sharpe. But for Calvert's threat to foreclose on the Note, Bollenbacher would not have signed a document with such representations.

---

[13] As the Court previously held while granting in part and denying in part summary judgment, the various exculpatory clauses found throughout the contractual documents at issue in this case do not immunize Cascade for its breach of fiduciary duty. (*See* Mem. Op. & Order 32-37, ECF No. 111.)

During that meeting in Seattle, Calvert refused to modify the Note in order to extend the maturity date, instead demanding a forbearance agreement (which became the Agreement). Calvert also agreed to travel to Mississippi to facilitate a meeting with People's Bank, with the goal of helping Livingston to obtain new financing. Shortly after the meeting in Seattle, Calvert threatened to cancel that trip if Livingston, Chestnut, and Sharpe did not first execute the Agreement. Threatening to withdraw from providing agreed assistance in order to force his clients to sign the Agreement was clearly contrary to his clients' best interests.

In 2017, Livingston had an agreement with a prospective buyer for cottage and commercial property parcels. Jamie Martin inquired with People's Bank about a payoff price to release the Deed of Trust that Calvert had assigned to the bank. Calvert explicitly instructed People's Bank to refuse to release the Deed of Trust unless and until Calvert was paid in full, including his professional fees, on the debt stated in the Agreement. In his testimony, Calvert agreed that the bank was legally obligated to release the Deed of Trust upon receipt of payment (in the same way that BankPlus released the 22 acres of property when Calvert tendered payment to BankPlus). *See* Miss. Code Ann.§ 89-5-21. His decision to instruct People's Bank to refuse payment for release of the Deed of Trust was clearly against the best interests of Livingston, Chestnut, and Sharpe. As a result, the negotiations with Crosstown Developers, LLC fell through.

C.  Billing for Time Spent Acting Contrary to Client Interests

Cascade operated under two clear conflicts of interest that jeopardized its ability to act in the best interests of Landrum, Sharpe, and Livingston.  Cascade's interests as fiduciary advisor and lender were diametrically opposed.  Calvert also took sides in the internal Livingston dispute between Sharpe and Landrum – his two clients – by continuing to separately advise the Landrums long after he knew that Sharpe and Landrum did not see eye-to-eye on the development project. Regardless of the work he actually did – be it consulting with Sharpe, Bollenbacher, and Landrum; consulting with just David and Jill Landrum after Sharpe said he wanted nothing more to do with Calvert; or seeking to collect on the collateralized debt he held as lender – he billed Livingston for his time as though he was operating under the consulting services agreement.  Billing his clients for time spent working against their best interests is a clear breach of the fiduciary duty of loyalty.

III.  REGARDLESS OF WHETHER CALVERT AND CASCADE MAINTAINED CORPORATE FORMALITIES, THE SAME RESULT OBTAINS

Livingston, Chestnut, and Sharpe argue that Cascade and Calvert are alter egos of each other – one and the same.  The Mississippi Supreme Court defines alter ego as "'[a] corporation used by an individual in conducting personal business, the result being that a court may impose liability on the individual by piercing the corporate veil when fraud has been perpetrated on someone dealing with the corporation.'" *Tanfield Eng'g Sys., Inc. v. Thornton*, 97 So. 3d 694, 702 (Miss. 2012) (quoting Black's Law Dictionary 86 (8th ed. 2007)).  However, "Mississippi courts

have not clearly articulated a standard for determining when an individual is using a corporation as an alter ego." *Jordan v. Maxfield & Oberton Holdings LLC*, 173 F. Supp. 3d 355, 360 (S.D. Miss. 2016) (citing *Buchanan v. Ameristar Casino Vicksburg, Inc.*, 957 So. 2d 969, 977 (Miss. 2007)). "As the *Thornton* case suggests, the issue is often discussed in conjunction with piercing the corporate veil, which has a different application and analysis – even if the two theories ultimately 'are interchangeable in result.'" *Id.* (citing Jackson & Miller, 3 Encyclopedia of Mississippi Law § 22:37 (2001)).

In the instant case, it does not matter whether Cascade is Mark Calvert's alter ego. Cascade and Calvert maintain that Cascade provided consulting services, and Cascade acted as lender; Calvert, individually, did neither. The record is not so clear, but given the equitable nature of the relief the Court finds warranted in this case, *see infra* § V, there are no monetary damages to collect from Calvert, individually. Moreover, to the extent that Cascade provided CTP services through Calvert, Cascade was charged with the same fiduciary duties, and Cascade breached its duty of loyalty to Livingston, Chestnut, and Sharpe. Mississippi law is also clear that corporate separateness should not be upheld where doing so would "subvert the ends of justice." *Id.* at 361; *Canadian Nat. Ry. Co. v. Waltman*, 94 So. 3d 1111, 1116 (Miss. 2012). If Cascade and Calvert instead took the position that one acted as advisor and the other as lender, Mississippi law dictates that this supposed distinction should not work to undermine equity.

## IV. The Statute of Limitations Does Not Bar Livingston, Chestnut, and Sharpe's Counterclaim and Third-Party-Claim

Cascade re-urges that any claim made by Livingston, Chestnut, and Sharpe stemming from the purchase of the BankPlus note and the formation of the Note is barred by the statute of limitations. Section 15-1-49 of the Mississippi Code – Mississippi's catch-all three-year statute of limitations – applies to the counterclaim for breach of fiduciary duty against Cascade. *Commercial Bank v. Smith Shellnut Wilson LLC*, 270 So. 3d 136, 146 (Miss. Ct. App. 2018). The limitation period begins to run from the moment the claim accrues – upon the conclusion of tortious conduct.

If the purchase of the BankPlus note and the formation of the Note were the only actions in breach of Cascade's fiduciary duty, the claims would indeed be time-barred. The Note was executed on April 18, 2014, but this lawsuit was not filed until December 1, 2017, and Livingston, Chestnut, and Sharpe did not file their Counterclaims until January 19, 2018. The three-year period would have run on April 19, 2017.

However, the Court has not found April 18, 2014 to be the date of the last tortious conduct in this case. Indeed, the Court has determined that Calvert repeatedly breached his fiduciary duty of loyalty to Livingston, Chestnut, and Sharpe; the formation of the Note was just the first noted instance. "[W]here a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury, or when the tortious acts cease." *Stevens v. Lake*, 615 So. 2d 1177, 1183 (Miss. 1993) (alteration in original) (quoting C.J.S., Limitations of Actions § 177 at 230-31 (1987)); *see also Thomas v.*

*Cook*, 170 So. 3d 1254, 1261 (Miss. Ct. App. 2015) ("As the supreme court said in *Stevens*, '[a] continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation.'"). Thus, where a tortious violation occurs outside the limitations period but is closely related to violations occurring within the limitations period, recovery is permitted on the theory that all violations are part of one continuing act. *Stevens*, 615 So. 2d at 1183 (citing *Hendrix v. City of Yazoo City, Miss.*, 911 F.2d 1102, 1103 (5th Cir. 1990)).

The breaches of fiduciary duty may have originated from the formation of the Note (i.e., they might not have occurred but for the formation of the Note), but they are subsequent independent breaches of a continuing duty, not merely additional harm caused by the formation of the Note. Accordingly, Livingston, Chestnut, and Sharpe's counterclaims are not time-barred.

V.   THE REMEDY

Livingston, Chestnut, and Sharpe ask the Court to (1) deem the Note and Agreement (as modified by the First Amendment) legally void and (2) assess punitive damages against Cascade for its conduct. "[I]t is axiomatic that a court should determine the adequacy of a remedy in law before resorting to equitable relief." *Franklin v. Gwinnet Cty. Pub. Sch.*, 503 U.S. 60, 75-76 (1992). Thus, "the proper inquiry would be whether monetary damages provide[] an adequate remedy, and if not, whether equitable relief would be appropriate." *Id.* at 76.

The Court has already held that Livingston, Chestnut, Sharpe, and Landrum are liable for breaching the Note and the Agreement, and that the Note and Agreement are enforceable against those parties. (*See* Mem. Op. & Order 39, ECF No. 111; Order 4, ECF No. 112.) Although Cascade repeatedly breached its fiduciary duty of loyalty towards Livingston, Chestnut, and Sharpe, these parties derived some benefit, however temporary, from Calvert's initial purchase of the BankPlus note. It would be unfair, therefore, to place Livingston, Chestnut, and Sharpe in a better position than they would have been had Cascade not breached its fiduciary duty. The Court finds that these circumstances make nigh impossible the task of determining a sum of monetary damages that would rectify the harm caused by Cascade's breach of fiduciary duty. It is also for this reason that punitive damages are inappropriate.

Accordingly, the Court turns to equity. Equitable relief is available to remedy a breach of fiduciary duty. *See Tyson v. Moore*, 613 So. 2d 817, 823-24 (Miss. 1992) ("Any transaction in which an attorney may have taken undue advantage of the client is voidable."); *Victory Lane Prods., LLC v. Paul, Hastings, Janofsky & Walker, LLP*, 409 F. Supp. 2d 773, 781 (S.D. Miss. 2006) ("Under the holdings in *Tyson,* if Victory Lane prevails on its breach of fiduciary duty claim against Defendants, it will be entitled to void its contract with Paul Hastings and seek return of the $60,000.00 in legal fees paid to Paul Hastings."). In the Court's opinion, Cascade's most egregious breaches of fiduciary duty involved the collateralization of its unsecured debt to the detriment of its clients. Certain other

breaches of fiduciary duty were only possible because of this collateralization. Accordingly, undoing the initial offense is the fairest and most efficient remedy.

Equity here would place the counterclaiming parties in the same position they would have occupied but for the breached fiduciary duties. After all, Cascade did pay for the overdue loan. Thus, for their default on the Note and the Agreement, Livingston, Chestnut, and Sharpe will be jointly and severally liable for $424,329.55 – the original payoff balance on the BankPlus note as of April 18, 2014.[14] Furthermore, the Deed of Trust for the 22 acres of land previously encumbered by the BankPlus note – and now encumbered by the Note and Agreement – secures only the $424,329.55 owed by Livingston, Chestnut, and Sharpe. No additional sum encumbers those 22 acres of land by virtue of the Note and Agreement. The due date of the $424,329.55 owed by Livingston, Chestnut, and Sharpe on the Note and Agreement shall be the date of final judgment in this case. Interest will accrue from the date of judgment at the rate of 6.5% per annum, the pre-default interest rate in the BankPlus note.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Cascade Capital Group, LLC breached its fiduciary duty to Livingston Holdings, LLC, Chestnut Developers, LLC, and Michael L. Sharpe. In equity, Livingston, Chestnut, and Sharpe's liability to Cascade for default on the Promissory Note (Ex. D-3) and the

---

[14] This does not affect David Landrum's liability in full on the Note and Agreement, which was already established by the [112] Order Granting Judgment on the Pleadings as to David Landrum. (*See* Rule 54(b) Judgment, ECF No. 150.) Furthermore, the Court expresses no opinion regarding the merits of Cascade's claimed professional fees or other loans. Whether they are owed or independently recoverable is not before the Court.

Forbearance Agreement (Ex. D-4), as amended by the First Amendment to the Forbearance Agreement (Ex. D-5), is reduced to $424,329.55. This sum is due on the date that Judgment in this matter is final. Interest will accrue from that date forward at a rate of 6.5% per annum until paid.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Deed of Trust for the 22 acres of land previously encumbered by the BankPlus note – and now encumbered by the Note and Agreement – secures only the $424,329.55 owed by Livingston, Chestnut, and Sharpe. No additional sum encumbers those 22 acres of land by virtue of the Note and Agreement.

**IT IS FURTHER ORDERED AND ADJUDGED** that the third-party claims asserted against Mark Calvert for breach of fiduciary duty by Livingston, Chestnut, and Michael Sharpe are **DISMISSED** with prejudice.

**SO ORDERED AND ADJUDGED** this the 6th day of March, 2020.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE